## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES of AMERICA** **ex rel. CHARLES BIRCHALL, Jr.** | Civil Action No.: |
| Plaintiff–Relator, | Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2) |
| v. | |
| **SPINEFRONTIER, INC.; KIC VENTURES, LLC; KINGSLEY CHIN, M.D.; IMPARTIAL MEDICAL EXPERTS, LLC.; KIC MANAGEMENT GROUP, INC. and AXIOMED, LLC.** | **COMPLAINT** |
| Defendants | |

### RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS

### INTRODUCTION

1.      The marketplace for medical devices is highly competitive, and especially in the spine surgery device market, it can be difficult for small companies to gain market share. This case concerns a spine surgery device manufacturer that gained market share by working from outside the system, and paying large kickbacks to surgeons that are illegal under the Anti-Kickback Statute. The manufacturer and the officers that run it have attempted to disguise the kickbacks by funneling them through a sham consulting company set up for that sole purpose in a conspiracy that violates the False Claims Act.

2.      The relator in this case discovered the illegal kickback scheme soon after being hired to run a different manufacturer that had recently been brought into the

same network of companies. The relator brought his concerns to others in the network of companies, including the owner and architect of the network. When his concerns were not addressed, he brought them to the Federal Bureau of Investigation, and was promptly suspended in retaliation prohibited by the False Claims Act.

## PARTIES

3. The relator in this action is Charles Birchall (the "Relator"), an individual who resides in Mentor, Ohio. He was suspended from his position as Chief Operating Officer of AxioMed, LLC for reporting the kickbacks scheme that facilitated the sales of medical devices.

4. SpineFrontier, Inc. ("SpineFrontier") is the manufacturer of the spine surgery devices for which that the kickbacks scheme was designed to facilitate sales. SpineFrontier is a corporation organized under the laws of the State of Delaware, and is registered to do business in the State of Florida and the Commonwealth of Massachusetts with a principal business address at 500 Cummings Center, Suite 3500, Beverly, MA 01915.

5. KIC Ventures, LLC ("KIC Ventures") is the parent company of SpineFrontier, and of AxioMed, LLC. KIC Ventures is a limited liability company incorporated under the laws of the State of Delaware, and is registered to do business in the State of Florida with a principal business address at 500 Cummings Center, Suite 3500, Beverly, MA 01915.

6. Kingsley R. Chin, M.D., ("Chin") controls all of the companies named as defendants in this action, and is the architect of the kickbacks scheme. Chin is an

2

individual who resides at 3326 NE 16th Place, Fort Lauderdale, FL 33305. Chin is licensed to practice medicine in the State of Florida, where he has a business address at 1100 W. Oakland Park Boulevard Unit 3, Wilton Manors, FL 33311.

7.      Impartial Medical Experts, LLC ("IME") is the sham consulting company whose sole purpose was to pay kickbacks to surgeons to facilitate the sale of SpineFrontier devices. IME is a limited liability company incorporated under the laws of the State of Delaware, with a mailing address of 3296 N. Federal Highway #11631, Fort Lauderdale, FL.

8.      KIC Management Group, Inc. ("KICMG") is one of a network of over twenty companies controlled by Chin, along with KIC Ventures. KICMG has also paid kickbacks directly to surgeons. KICMG is a corporation incorporated under the laws of the State of Delaware, with a mailing address of 500 Cummings Center, Suite 3500, Beverly, 01915.

9.      AxioMed, LLC ("AxioMed") is the Relator's employer. It is a limited liability company organized under the laws of the State of Delaware, with a principal place of business in Garfield Heights, Ohio. It is wholly owned and operated by KIC Ventures, LLC. AxioMed is a spinal orthopedics company that designs and manufactures artificial lumbar and cervical discs.

## JURISDICTION AND VENUE

10.      Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* In addition, the FCA

3

specifically confers jurisdiction upon the United States District Court for claims brought under 31 U.S.C. § 3730. 31 U.S.C. § 3732(a). The FCA confers subject matter jurisdiction upon the United States District Court for retaliation claims brought under 31 U.S.C. § 3730(h). 31 U.S.C. § 3730(h)(2).

11.    This District Court has personal jurisdiction over Chin, SpineFrontier, KIC Ventures, IME, KIC Management and AxioMed pursuant to 31 U.S.C. § 3732(a) because the FCA authorizes nationwide service of process and all such parties have sufficient minimum contacts with the United States of America.

12.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because SpineFrontier and KIC Ventures transact business in this judicial district, because Chin is those companies' CEO, because KIC Ventures controls IME and AxioMed while doing business in this judicial district, and because KICMG transacts business in Massachusetts and has registered a Massachusetts address as its principal place of business.

## FACTUAL AND STATUTORY BACKGROUND

### I.    KINGSLEY CHIN AND HIS CLOSELY RELATED COMPANIES

13.    Kingsley R. Chin, M.D. is the CEO of Defendants SpineFrontier and KIC Ventures and the driving force behind a network of more than twenty interrelated corporations. Chin holds a medical degree from Harvard Medical School, trained at several renowned hospitals, is listed as a co-inventor of more than forty patents, and identifies himself as a "professor" at Florida Atlantic University Charles E. Schmidt College of Medicine where, along with over 1,200 others, he has a non-teaching position

4

in the school's "Affiliate Faculty" program. Chin currently maintains a medical practice as a surgeon in his own ambulatory surgery center in Florida. In all facets of his professional life, however, Chin is not what he seems.

14.     Chin is currently licensed to practice medicine in the State of Florida, but had been licensed in Pennsylvania and Massachusetts. In all three states, he has been disciplined by the medical profession's governing body. As the State of Florida Medical Board determined in March 2004, Chin had been put on probation while training at Beth Israel Deaconess Hospital in Boston for failing to properly record a discharge summary of a patient who died after spending several days in the intensive care unit following surgery. For failing to disclose this probation to the Florida board when applying for a license to practice, Chin was found guilty of violating Section 456.331(1)(gg), Florida Statutes.

15.     Chin had also failed to disclose this probation to the medical boards in Pennsylvania and Massachusetts. After being fined by the Pennsylvania board, Chin voluntarily surrendered his license to practice in that state. In Massachusetts, Chin was disciplined more severely. In December 2005, the Board of Registration in Medicine fined Chin $7,500 and issued him an official reprimand for failing to disclose the Beth Israel Deaconess probation not only on his original application for a license, but in a recent renewal application – despite the Florida discipline, which Chin had also failed to disclose in his renewal application. Chin's license to practice in Massachusetts was not renewed, and lapsed the following month.

5

16.     Currently Chin controls a network of at least twenty companies (collectively, the "KIC Companies") through three related entities: KIC Ventures, which manages SpineFrontier; Kingsley Investment Company; and KICMG. For their business addresses, each of the KIC Companies use either SpineFrontier's business address in Beverly, MA; the address of Chin's ambulatory surgery center, currently in Fort Lauderdale, FL; or one of a network of rented mail boxes in the greater Fort Lauderdale area, including UPS Stores in Oakland Park and Wilton Manors, United States Postal Service boxes in two Fort Lauderdale locations, and a U-Haul location in Davie, FL.

17.     Although Chin ultimately controls each of the KIC Companies as CEO of KIC Ventures, Kingsley Investment Company or KICMG, other individuals assist him and are closely involved in their management. Aditya Humad is President and CFO of SpineFrontier, as well as its parent company KIC Ventures. In his role as President and CFO of KIC Ventures, Humad also helps manage AxioMed (where he is also the CFO); SenseDriver, LLC; INVUHoldings, LLC; LESSurgeons Institute Holdings, LLC; LESSurgeons Institute Florida, LLC; 1801 Sample Road LLC; and other companies. Humad is also President, CFO and Manager of KICMG, which manages businesses associated with Chin's medical practice, including IMIS, LLC ("IMIS"); LESS Institute Clinical, PLLC; Modern Doctors, LLC; Modern Anesthesia Company, LLC (a/k/a "MAC"); and Surgical Management and Billing, LLC. Humad also helps manage Medinvus, LLC, and briefly served as an agent of the Society of Facet Surgical

6

Techniques and Technologies, Inc., a Florida non-profit corporation with 501(c)(3) tax exempt status (Chin is now that entity's only agent or director).

18.     Chin's domestic partner and girlfriend, Vanessa Dudley (a/k/a Vanessa Dudley Chin), is also intimately involved in Chin's corporate network. She is the sole employee of IME, a Delaware company that identifies as its principal place of business a Fort Lauderdale branch of the United States Postal Service, a location where Chin leases a mailbox used to manage his network. She is an authorized representative of LESS Institute Clinical, PLLC, one of businesses associated with KICMG, and an agent of 1801 Sample Road LLC, which through a series of three other businesses incorporated in Delaware and registered in Florida is controlled by KIC Ventures.

19.     With the help of Humad and Dudley, Chin runs this network of parallel companies as if they were a single entity. The intermingled bank accounts and funds of all of the businesses are all managed through a single software account, with Humad frequently making transfers from one account to the other for the purpose of disguising payments. With the possible exception of SpineFrontier, all of the KIC Ventures companies, including AxioMed and IME, are undercapitalized and only the strategic movement of money by Humad from one bank account to the other allows the various companies to pay their bills. These intercompany transfers are not reconciled. Even with these transfers, bills are not paid on a timely basis. With the possible exception of SpineFrontier, many, if not all, of the KIC Companies are insolvent due to their inability to pay their bills as they become due.

20. Revenue earned by the KIC Companies, when it is not disbursed to pay bills of related KIC Companies, ultimately flows to the management companies, KIC Ventures and KICMG, and then to Kingsley Investment Company, from which it is disbursed to Chin's personal bank account.

21. Despite the network of mail boxes scattered throughout the Fort Lauderdale area, all of the KIC Companies, including those associated with Chin's medical practice, either employ, or are managed by, a company that identified its principal place of business as 500 Cummings Center #3500, Beverly, MA. This is SpineFrontier's physical address. Yet, notwithstanding the fact that many of the KIC Companies claim to have their principal place of business in Massachusetts, SpineFrontier is the only one of the companies actually registered to do business in Massachusetts.

22. On information and belief, only five of the companies in Chin's network pay wages to any employees. KICMG controls one arm of Chin's network associated with his medical practice in Florida, including IMIS, which is the practice, Surgical Management and Billing, LLC, Modern Anesthesia Company, LLC, LESS Institute Clinical, PLLC and several others. However, in this arm of the network, only KICMG and IMIS have paid employees. The other arm of Chin's network is controlled by KIC Ventures, and ultimately Kingsley Investment Group. Under that arm, which includes IME, SpineFrontier, AxioMed and other companies, only SpineFrontier and AxioMed employ multiple employees. Chin, however, refers to SpineFrontier employees as his "KIC Ventures Team." Also associated with KIC Ventures is IME, the only other entity

8

within the network that has an employee. That employee is Chin's girlfriend, Vanessa Dudley, who has no control over IME's finances. Humad controls IME's finances, subject to Chin's instructions.

23. All of the KIC Companies have a single owner. The same persons participate in each company's management, in precisely the same roles. Most of the companies have no business purpose at all except to act as a manager of one of the other companies. While Chin does provide medical treatment through one or more of the companies, all other business performed in the network is to accomplish a single purpose: to sell as many SpineFrontier devices as possible, even in dereliction of federal law. The only reason the businesses are set up as separate entities is to make it appear as if no laws are being broken.

## II. SPINEFRONTIER'S PRODUCTS AND THE HIGHLY COMPETITIVE MARKET IN WHICH IT PARTICIPATES

24. Spine surgeries have been a common occurrence in the United States for nearly thirty years. Different surgical procedures may be performed on a patient's spine to alleviate a variety of symptoms a patient may experience. Spinal fusion, a joining of spinal bones called vertebrae, is the most common spine surgery performed in the United States for the treatment of spinal degenerative disorders and back pain.

25. Alternatives to spinal fusion surgery, such as disc replacement surgery which involves the removal of a damaged spinal disc and the insertion of an artificial disc to take its place, are also frequently performed in the United States. Disc replacement surgery has become an increasingly popular alternative to spinal fusion

9

due to advances in artificial disc technology, as well as the fact that many of these devices can be implanted through minimally invasive surgical techniques at outpatient facilities.

26.     Spinal fusions, disc replacement surgeries and other spine surgery procedures often require the use of surgical devices, such as bone screws, rods, plates and interbody fusion cages to facilitate the procedures. Despite some advancements in disc replacement technology, most of these surgical devices have not undergone significant change in the last two decades. The vast majority of these devices receive approval under the Food, Drug and Cosmetic Act's 510(k) process, which is a streamlined process that allows a new device, substantially equivalent to an already existing and approved device, to receive FDA clearance without undergoing the rigors of the FDA's Pre-Market Approval process. As many spine device manufacturers pattern their equipment design on already existing devices, there are few meaningful differences among spine surgery devices from one manufacturer to the next.

27.     Founded in 2006, SpineFrontier is a medical device company that designs, develops, and markets implants and instruments used by surgeons to perform surgeries on different regions of the spine. SpineFrontier's devices include cervical plates, FacetFuse MIS screw systems, interspinous fixation systems, pedicle screw systems, MIS pedicle screw systems, spinal invertebral body fusion devices, lumbar invertebral body fusion devices, anterior lumbar invertebral body fusion devices, biologics materials, and retractor systems.

10

28.     All of SpineFrontier's devices were designed by Kingsley Chin and were approved under the 510(k) clearance process. And, like most manufacturers' devices in the industry, there is no proven advantage or benefit gained by using a SpineFrontier device over a competitor's.

29.     The spine surgery device market in the United States is a multi-billion dollar industry, dominated by two of the largest medical device companies in the world. Medtronic is the world's third largest medical device company and the leader in spinal and musculoskeletal medical devices. Medtronic's Spinal and Biologics division controls the largest percentage of the U.S. market, as its products represent approximately 35% of all spine surgery devices purchased each year.

30.     DePuy Synthes Spine, Inc., part of the Johnson & Johnson Family of Companies, is the second largest spine company in the world. DePuy Spine controls approximately 26% of the spinal surgery device market in the United States and is Medtronic's biggest competitor.

31.     Stryker Corporation is a distant third, controlling about 9% of the spine surgery device market in the United States.

32.     Dozens of smaller companies makeup the remaining 30%, all vying for a larger share of the market. SpineFrontier is one of the smaller spine surgery device manufacturers, with a market share of less than 1%.

33.     Most major hospitals and surgical centers in the United States contract with either Medtronic or DePuy Spine for all of their spine surgery device needs.

11

Smaller companies, like SpineFrontier, are therefore forced to cater to smaller providers and physician owned practices.

34. SpineFrontier sells its surgical devices on consignment to hospitals and surgical centers. Accordingly, there is no overhead cost for such institutions to stock such devices on their shelves; they do not pay anything until the devices are used in a procedure for which they will be reimbursed. In such situations, it is the spinal surgeon who selects which hardware will be used in the procedure. The same decision by the spinal surgeon determines which device company will receive a sizable sale due to the institution's use of consigned equipment. SpineFrontier's device kits, for example, range from $5,000 to $10,000 depending on the type and amount of equipment included. SpineFrontier's manufacturing costs for its devices are nonetheless quite low; less than 10% to 20% of the income generated from a single device kit. Each decision by a spine surgeon to select SpineFrontier surgical hardware for a spinal surgical procedure results in thousands of dollars of income to SpineFrontier and its owner, KIC Ventures.

35. Thus, SpineFrontier relies heavily on its sales relationships with surgeons and referrals made by those surgeons. SpineFrontier can make only limited progress in market share by competing on price. Not only does such competition reduce income on completed sales, but price is ordinarily not a factor to the physicians who decide which products are selected for a particular procedure – since he does not pay for it, ordinarily the physician does not care about a the device's price. But, in an industry where the goods manufactured are fungible and a few large corporations dominate the

12

marketplace, something more is needed to convince physicians to select SpineFrontier products over the market leaders.

36.     SpineFrontier's management team realized that the only reliable way to steadily increase its market share and stave off competition was to remunerate physicians who used its products. Payment of kickbacks to incentivize physicians to use a company's products is illegal. But KIC Ventures and SpineFrontier thought it could get away with such a scheme if the remuneration to physicians took the form of consultation or evaluation fees, and the payments were ostensibly made by a third party. In fact, such an arrangement still constitutes an illegal kickback scheme and causes false claims to be routinely presented to the United States.

## III.    THE MEDICARE PROGRAM PROHIBITS PARTICIPATION BY THOSE WHO PAY OR RECEIVE KICKBACKS

37.     Medicare is a social insurance program administered by the United States government, providing health insurance coverage to people who are aged 65 and over, who are disabled and have been receiving either Social Security benefits or the Railroad Retirement Board disability benefits for at least 24 months, who receive dialysis for end stage renal disease or need a kidney transplant, or who have amyotrophic lateral sclerosis and are eligible for Social Security Disability Insurance. For those Medicare beneficiaries who undergo spine surgery, Medicare's payment covers the cost of any spinal devices used in the surgery, including any SpineFrontier products selected by the surgeon.

13

38.     The United States also pays for medical devices through a number of other programs. The Department of Veterans Affairs, the Department of Defense's TRICARE program, and the Federal Employees Health Benefit Plan each pay for medical devices with funds provided by the United States. Hospitals owned and operated by the Veteran's Administration and hospitals operated by the branches of the United States military directly purchase medical devices.

39.     Medicaid is a joint program of the United States government and state governments to provide medical services, including prescription devices, to persons who could not otherwise afford them. Medicaid programs are jointly funded by state and federal governments, but each program must meet minimum requirements, established by federal law, in order to obtain federal funding. All of the states and the District of Columbia participate in Medicaid and use state or district funds to pay for medical devices.

40.     The False Claims Act prohibits the submission of false claims, statements, and records to federal health care programs, including Medicare and Medicaid. It provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for a civil penalty plus three times the amount of damages which the United States sustains because of the act of that person. 31 U.S.C. § 3729(a)(1)(A) and (B).

14

41.     The False Claims Act also provides that persons are liable to the United States for penalties and for three times damages sustained by the United States for conspiring to commit a violation of 31 U.S.C. § 3729(a)(1)(A) or (B). 31 U.S.C. § 3729(a)(1)(C).

42.     The Medicare-Medicaid Antifraud and Abuse Amendments contain an Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "AKS") which enacted a *per se* prohibition on the payment of kickbacks in connection with medical services. The statute prohibits making any "payment," in cash or in kind, to induce a person to refer or order any medical services that are paid for in whole or in part by federal funding, including services provided under Medicare and Medicaid.

43.     Under the AKS, 42 U.S.C. § 1320a-7b, knowingly and willingly offering or paying remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such a person to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program is guilty of a felony, punishable by fine up to $25,000 or imprisonment up to five years or both.

44.     Under the AKS, "remuneration" is defined as "transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6).

45.     Actual knowledge or specific intent to violate the AKS is not required. 42 U.S.C. § 1320a-7(b)(h).

15

46.     The AKS applies to all federal health care programs, defined as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of Title 5)." 42 U.S.C. § 1320a-7b(f).

47.     Medicare rules prohibit reimbursement of any claim where services or goods covered by the claim, in whole or in part, have involved unlawful remuneration or kickbacks prohibited by the AKS. Thus, providers participating in Medicare, Medicaid, Tricare and other federal healthcare payment programs agree when they join the programs that they will comply with the AKS, and that they will not submit any claim that will result in reimbursement for a service or a good in which a kickback is involved. Each provider expressly acknowledges that compliance with the AKS is a condition precedent of receipt of any payments. Additionally, each claim submitted by program participants includes a certification by the provider to that end. Accordingly, where a kickback has been paid to a physician to reward or incentivize the provider to use a SpineFrontier product in spine surgery, no claim by the physician in connection with the surgery can be submitted to Medicare or Medicaid or the other federal programs. Nor may the institution where the procedure was performed seek reimbursement for the procedure, even if the institution had not received the payment or was unaware of it.

48.     Any claim for payment submitted to a federal health care program that results from, or is tainted by, a kickback is a false claim and subjects the billing provider

16

to liability for three times damages and civil penalties under the False Claims Act. 42 U.S.C. § 1320a-7b(g). As will be described hereafter, KIC Ventures, IME and SpineFrontier have caused numerous false claims, tainted by kickbacks, to be presented and paid by the United States.

## IV. THE RELATOR DISCOVERS THAT THE KIC VENTURES COMPANIES ARE PAYING KICKBACKS TO DOCTORS WHO USE SPINE FRONTIER PRODUCTS

49.     AxioMed, a spinal orthopedics company, focuses on the development of products that are designed to restore spinal function in patients with degenerative spine disease. AxioMed designs and manufactures artificial lumbar and cervical discs. Its products are not sold in the United States and will not be sold in the United States until those products receive Pre-Marketing Approval from the United States Food & Drug Administration. At all relevant times AxioMed was based in Garfield Heights, Ohio right outside of Cleveland, which is where it is headquartered.

50.     The Relator was one of the founders of the predecessor to AxioMed, AxioMed Spine Corporation ("ASC"), which was formed in 2001. The Relator left ASC to pursue other opportunities in business consulting and entrepreneurial assistance to a non-profit organization, but kept in contact with ASC's other co-founders followed the company's development.

51.     From its inception in 2001 through October 2014 ASC raised over $70 million and developed its innovative medical devices to be used in spine surgery. Unlike SpineFrontier's products, ASC's artificial discs were not based on existing

17

technology and could not use the FDA's 510(k) process to obtain approval for use in the United States. ASC's products had to go through complete pre-marketing approval process including the conduct of clinical trials to prove the products' efficacy and safety. Although ASC's products have been approved for some markets in Europe, through October 2014, it was still going through the expensive and time consuming process of obtaining FDA approval.

52.     In October 2014, AxioMed Spine Corporation ran out of working capital and its creditors foreclosed on their loans. The corporation's assets were put up for sale. In November 2014, KIC Ventures formed AxioMed LLC to purchase the ASC assets for approximately $1.7 million, with a promissory note to pay an additional $5 million if the lumbar disc was granted approval for sale and distribution in the United States. AxioMed borrowed the funds for the asset purchase from Chin and KIC Ventures pursuant to promissory notes that paid Chin and KIC Ventures 20% interest on their loans.

53.     AxioMed generates some revenue from its sales in Europe, but expected that it would not earn significant revenue until it received approval from the FDA to market its products in the United States. It required a management team that could both oversee the final stages of the FDA approval process as well as the initiation of marketing in the United States after the receipt of approval. KIC Ventures had no one with the appropriate experience or the ability to run a company based in Ohio. Shortly after KIC Ventures acquired AxioMed, Kingsley Chin approached the Relator to return to AxioMed as the Chief Operating Officer, running AxioMed operations in Ohio.

18

54.     On December 15, 2014, AxioMed, formally offered the Relator the position
as AxioMed's Chief Operating Officer.  The offer was tendered in a letter from
AxioMed's Chief Financial Officer, Aditya Humad, that set forth the terms and
conditions of employment and described the COO's duties and responsibilities.
Humad was also the CFO of SpineFrontier and KIC Ventures.

55.     As COO, Relator was to "use [his] best efforts to promote the interests of
[AxioMed]" and "[p]rovide day-to-day leadership and management...driving the
company to achieve and surpass sales, profitability, cash flow and business goals."
Relator was also expected to "[r]eview opportunities and establish strategic direction"
for AxioMed, "[d]irectly manage corporate headquarters in Cleveland," which included
oversight and management of a wide range of departments including the quality and
regulatory department, and "raise investments."

56.     The offer letter set Relator's compensation at a base salary of $150,000.  As
COO, Relator was also promised 1% of the company, in the event of a sale or IPO, in the
form of phantom performance units.  The letter guaranteed employment for a period of
6 months.  According to the offer letter, severance packages for termination without
cause would be based on tenure, but no severance pay would be given in the event of
termination for cause.  Relator accepted the terms of the offer and began his new
position as AxioMed's COO on January 5, 2015.

57.     Relator reported to AxioMed's President, Jake Lubinski, who was also the
COO of SpineFrontier.  Despite his title as AxioMed President, Lubinski devoted almost

all of his attention to SpineFrontier. During Relator's tenure as COO, Lubinski only visited AxioMed's offices on two occasions, totaling three days.

58.     Once he joined AxioMed, Relator also learned that he had no control over any matter relating to AxioMed's finances. Relator was not a signatory on the AxioMed checking account, and had no ability to direct payments. Humad had complete control over all AxioMed finances and was the only person who could authorize payments on AxioMed's behalf. Relator could identify creditors or other persons who he believed should be paid, but had no ability to ensure that they received payment. Relator had no input into AxioMed's budget, and did not even know how much was available to pay AxioMed creditors.

59.     Relator's duties, as the AxioMed COO, included setting up sales outside of the United State. To this end, in mid-to-late January 2015, Relator contacted Chris Lyons, the Director of Global Business Development at Medtronic – one of the world's largest medical device companies. Having both worked in the medical device industry for years, Relator and Lyons knew each other well. Relator believed that Medtronic represented a significant opportunity for AxioMed, both as a potential distributor of its products and as a potential investor.

60.     As Relator anticipated, Lyons told the Relator that Medtronic had interest in distributing AxioMed's products and might be interested in investing in the company. Lyons requested a visit and presentation to Medtronic, and on February 8, 2105, Chin, Lubinski, Humad, and Eric Smith, Director of Clinical Marketing for

AxioMed, accompanied the Relator to Medtronic's offices. The majority of AxioMed's presentation was given by Chin.

61.    The presentation did not go well. Shortly afterward Lyons informed Relator that Medtronic was no longer interested in doing business with AxioMed, and asked him to inform his superiors of Medtronic's decision. In the same conversation, Lyons apologized to Relator for not fully investigating AxioMed and its corporate affiliations before setting up the presentation. Lyons told Relator that, had Medtronic known of Kingsley Chin's and KIC Ventures' involvement in AxioMed before he set up the presentation, he would have canceled the presentation. When Relator pressed Lyons for a reason for Medtronic's distaste for Chin and KIC Ventures, Lyons informed him that Medtronic had reason to believe SpineFrontier was engaged in illegal conduct, specifically "paying surgeons for business." Lyons claimed Medtronic, and others in the industry, had heard widely circulated rumors that KIC Ventures was paying surgeons illegal kickbacks for using SpineFrontier devices and that KIC Ventures, SpineFrontier, and Dr. Chin, had developed a bad reputation in the industry. According to Lyons, it was far too risky for Medtronic to become associated with AxioMed, as long as AxioMed was owned by KIC Ventures.

62.    On or around February 15, 2015, Relator sent an email to Dr. Chin, Humad, Jake Lubinski and Eric Smith, informing them that Medtronic was not interested in conducting business with AxioMed. The email stated that Medtronic's decision not to work with AxioMed was due to Medtronic's belief that AxioMed was a "compliance risk."

21

63.   Dr. Chin responded to the Relator's email by chastising the Relator for discussing the matter with Medtronic; Chin informed the Relator that Chin was the sole individual responsible for initiating strategic business decisions on behalf of AxioMed. Neither Chin, nor any of the other recipients of the email inquired about Medtronic's concern that KIC Ventures/SpineFrontier was a "compliance risk" so great that it would not want to be associated with one of its sister companies, AxioMed.

64.   Relator was very surprised at Chin's lack of concern regarding Medtronic's reason for refusing to do business with AxioMed. Relator expected that as AxioMed's CEO, Chin would want to know why Medtronic believed his organization was a compliance risk. An ethical and astute CEO should have acted swiftly to investigate and remedy any potential compliance problem.

65.   As an officer of AxioMed, Relator believed it was both his ethical and legal duty to investigate Medtronic's allegation, particularly because the other members of AxioMed's senior management had very close ties with SpineFrontier. Throughout February 2015, Relator had multiple conversations with his immediate supervisor, Jake Lubinski, describing the specific reasons why Medtronic did not want any involvement with KIC Ventures or any other entity owned by Chin. Relator specifically told Lubinski that he was concerned that SpineFrontier might be paying surgeons illegal remuneration. Lubinski told the Relator that he should not be concerned. Although Lubinski admitted that surgeons who used SpineFrontier products were paid, he explained that these doctors received "consulting fees", and that these fees were perfectly legal.

22

66.     In late February 2015, SpineFrontier's Vice President of Sales, John Miller,

inquired as to how AxioMed's presentation to Medtronic had gone. Relator told Miller

that the presentation had not gone very well, and that Medtronic was not interested in

doing business with AxioMed as long as AxioMed was associated with KIC Ventures

and SpineFrontier. Relator told Miller that Medtronic believed that SpineFrontier was

paying illegal kickbacks to surgeons for using SpineFrontier devices in their surgeries.

Miller also admitted that doctors were being paid who used SpineFrontier products, but

claimed that no illegal activity was taking place. According to Miller, SpineFrontier did

not directly pay surgeons. Instead, the payments, for "product evaluation" were made

by IME. Miller told Relator that funds would be moved from SpineFrontier to KIC

Ventures and that KIC Ventures would then transfer the money to IME. Once IME had

received the money transfer, it would then distribute payments to surgeons based on

SpineFrontier sales generated by the surgeon. Miller also informed the Relator that IME

was owned by Chin and run by Chin's girlfriend, Vanessa Dudley. Miller told Relator

that he did not think these payments were illegal, as they were not made directly by

SpineFrontier.

67.     Notwithstanding Miller's assurances, based on his twenty years in the

medical device industry, the Relator did not believe the payments Miller described

were appropriate. Relator sought further guidance from Theresa Schroeder, AxioMed's

VP of Clinical & Regulatory Affairs, and acting compliance officer.

68.     Relator described the SpineFrontier-KIC Ventures-IME-physician
payment scheme to Ms. Schroeder. Ms. Schroeder told Relator that if the payment
scheme he described was taking place, it was likely a violation of the AKS.

69.     Ms. Schroeder called Ed Rule, a compliance officer and whistleblower
representative for SpineFrontier, to ask him if he had any information regarding
physician payments. Mr. Rule confirmed that KIC Ventures was indeed transferring
money to IME and that IME was using the funds transferred by KIC Ventures to pay
surgeons who used SpineFrontier products. Mr. Rule confirmed that none of the
payments IME made to physicians were being recorded as required by the Physician
Payments Sunshine Act – a law passed as part of the Patient Protection and Affordable
Care Act, which requires manufacturers of drugs and medical devices that participate
in U.S. federal health care programs to report payments given to physicians. Ms.
Schroeder relayed the information she received from Ed Rule to Plaintiff.

70.     Armed with a strong indication that KIC Ventures was engaged in illegal
activity, Relator met with Sue Carrera, AxioMed's Business & Operations Manager, to
determine if he could find hard evidence to support his belief that KIC Ventures was
involved in a fraudulent kickback scheme. Sue Carrera has access to AxioMed's
financial software system, which is the same system KIC Ventures uses for many of its
companies – including AxioMed, and IME. By accessing the financial database, Sue
Carrera was able to view financial transactions made by KIC Ventures, AxioMed, IME,
and several other KIC Companies.

24

71.     On or around April 15, 2015, Relator told Ms. Carrera that he believed KIC

Ventures was engaged in an illegal kickback scheme and that he wanted to view

company finances to see if money was being transferred from KIC Ventures to IME, and

ultimately to physicians.  Ms. Carrera and Relator accessed the database and saw

multiple transactions in which funds were transferred from KIC Ventures' bank

accounts to IME accounts.  They were also able to see corresponding payments from

IME to physicians.

72.     The financial database revealed that hundreds of thousands of dollars in

payments were made to physicians in the first three and a half months of 2015 alone.

This large amount of money that IME was paying physicians appeared very suspicious

to Relator, as did the payment amounts each physician was receiving individually –

which ranged from under $1500 to over $43,000.  These payments did not appear to be

"consultation fees," as John Miller and Jake Lubinski had told Relator.  Relator noted

that there was no discernable amount set as a standard "consultation fee" rate.

Furthermore, most of the payments seemed extraordinarily high for consulting fees – as

many of the payments physicians were receiving were well over $15,000 or $20,000.

Copies of the database records reflecting payments to physicians from IME are attached

as Exhibit 1.

73.     Relator researched the physicians who were receiving payments from

IME, learned that all of the physicians who had received payments from KIC

Ventures/IME were spine surgeons, and that many of the payments to the physicians

were sent to home addresses rather than to physician practices or offices.  After viewing

the database, Relator confirmed through the CMS Sunshine Act database, available through the CMS website, that none of the payments IME made to physicians had been reported as required by law.

74.     After discovering documentation of IME's money transfers to physicians, Relator asked Ms. Carrera to call Diana Couillard, a Senior Staff Accountant at KIC Ventures-SpineFrontier. Ms. Carrera asked Ms. Couillard to explain the payments she was seeing from IME to surgeons. Ms. Couillard told Ms. Carrera that IME paid surgeons for using SpineFrontier products. When Ms. Carrera expressed concern over the legality of the payments, Ms. Couillard replied that she thought this payment arrangement between IME and spine surgeons was similar to consumer rebates retailers provide customers for purchasing their products and was not, therefore, problematic.

## V.     THE KICKBACK SCHEME

75.     The kickback scheme directly results from the efforts of Kingsley Chin to set up a network of spine surgeons who would use his techniques and his equipment to perform spine surgery. The kickbacks are critical components necessary to attract surgeons to Chin's "LESSurgery" network, a brand name he created and controls.

76.     Under the guise of instruction, Chin targeted surgeons less than ten years out of medical school, believing that they would be more likely to "feed the need to join" his less invasive back surgery "movement." At least three surgeons that have joined the network have received steady kickbacks payments from Chin, including Dr. Roger Sung of Colorado Springs Colorado, Dr. Bonaventure Ngu of The Woodlands, Texas, and Dr. Josue Gabriel of Columbus, Ohio. More recently, Chin has developed an

online component to the "LES" network, believing it will start to build connections that kickbacks may strengthen.

77.    The kickbacks themselves are funneled through IME.  Like most of Chin's companies, it has no real place of business, but lists a Florida address although it is not registered to do business there.  IME is staged as a consulting and expert witness company with physicians with a wide range of expertise allegedly available for hire, but IME's supposed business was a sham.  IME has no customers and its only function is to act as the bagman that makes the payoffs to participating physicians.  IME has no income; its only revenue are the transfers made to it by SpineFrontier (or the other KIC Companies when SpineFrontier does not have available cash to fund the kickbacks) which are then transferred to the participating surgeons.  The "consultants" interact with IME through a web portal at the IME website with the URL www.impartialmedicalexperts.com/spinefrontier.  Chin, the KIC Companies, and the consultants all understand that the payments are directly related to SpineFrontier devices.

78.    The justification for the payments is that physicians "evaluate" the medical devices they have used after surgery.  Such evaluations are shams, and in any event, SpineFrontier does not require multiple evaluations from the same physician performing the same or comparable operations.  The payments are not proportional to the time or energy necessary for the physicians to complete the unnecessary evaluations.  The amount paid to the surgeons far exceeds the fair market value of any

marketing information SpineFrontier receives in return. Moreover, SpineFrontier has no use for, and does not use, the vast majority of the "evaluations" IME pays for.

79. At the beginning of 2015, the IME "operating account" had $64,579. Between January 1 and February 10, twenty one kickbacks were paid to surgeons, ranging from as low as $1,425 to as high as $43,700 and totaling almost a quarter million dollars in that span. IME received no revenue from any outside client seeking medical opinions during the first quarter of 2015. At one point, the IME account was overdrafted by nearly $200,000, and it appears that Bank of America would no longer clear IME's checks. A transfer of $19,000 directly from the SpineFrontier operating account did not ameliorate the problem, but a larger $150,000 payment from SpineFrontier did. Another infusion of funds from SpineFrontier occurred in mid-March when $158,250.00 was transferred into the account. Shortly thereafter, another KIC Ventures company, KICMG, transferred another $100,000 to the IME Account. Additionally, KICMG paid another ten kickbacks to SpineFrontier customers directly, totaling $83,362 (each payment bore a special note in the KIC Ventures accounting system that it was for "IME consult payroll").

80. The kickback scheme extended to several states across the country, with payments to doctors in Arkansas, Colorado, Florida, Illinois, Maryland, New York, Ohio, South Carolina, Texas, and Virginia. On information and belief, kickbacks were paid in additional states, as well.

81. One of the surgeons who received kickbacks was Jeffrey Carlson, who practices at 250 Nat Turner Boulevard, Newport News, VA. Dr. Carlson has Medicare

28

and Medicaid patients, and continues to accept new Medicare patients. Between February 28 and April 17 of this year, 2015, Dr. Carlson received payments of $16,150, $23,750 and $16,150 from IME, and a payment of $13,300 from KICMG. In total, he received $57,350 in just that seven week period as kickbacks for his use of SpineFrontier devices. On information and belief, Dr. Carlson has received kickbacks in other time periods, as well.

82.     Another recipient was Roger Sung, one of the surgeons connected to Chin's fraudulent scheme through his LESS network. Dr. Sung practices at 4110 Briargate Parkway #300, Colorado Springs, CO. Between January 31 and April 17, 2015, Dr. Sung received payments of $9,262.50 and $21,375 from IME, $1,469.33 from IMIS, and $17,812.50 from KICMG, totaling $49,919.33. On information and belief, Dr. Sung has received kickbacks in other time periods, as well.

83.     Dr. Francis Paul Degenova also received kickbacks for SpineFrontier business. Dr. Degenova's practice, Sports Medicine Grant, Inc., is at 323 E Town St., Columbus, OH. He received five kickbacks between January 31 and April 15, 2015, of $43,700, $13,300, $19,950, $14,725, and $18,525, for a total of $110,200 in kickbacks in less than three months. On information and belief, Dr. Degenova has also received kickbacks in other time periods, as well.

84.     Other surgeons who received kickbacks in early 2015 include Dr. Dhruv Pateder of 1860 Town Center Dr. #300, Reston, VA, who received $31,112.50 in kickbacks between February 28 and April 17, 2015; Dr. Josue Gabriel of the Spine Institute of Ohio, 340 E Town St. #8, Columbus, OH, who received $57,712.50 between

February 28 and March 31, 2015; and Dr. Vivek Kushwaha of Orthopaedic Associates, LLP, 5420 West Loop S #2300, Bellaire, TX, who received kickbacks of $56,287.50 between January 31 and March 31, 2015.

85.     At all times, SpineFrontier and KIC Ventures had control of the IME payments to physicians through Humad's control of the IME account. At all times, the payees were either known to SpineFrontier, or could have been determined by a quick review of the accounting system. At all times Chin, SpineFrontier and KIC Ventures knew that money they transferred to IME was going to pay off physicians who used its devices.

86.     The DOLLAR amounts of the kickbacks were substantial. For the four months for which the Relator has records, close to $500,000 was paid to surgeons who were SpineFrontier customers. In the first four months of 2015 alone, at least ten surgeons received over $20,000 in kickbacks for facilitating the purchase of the devices and the billing of surgeries to government payors and private insurance. Based on the information THE Relator received from Miller and other SpineFrontier employees, the payoffs through IME had been occurring for years prior to the Relators' discovery of them. The kickbacks paid through IME tainted all claims made to the United States for payment for any surgeries that deployed SpineFrontier devices. Several such claims were made. Each and every one of the surgeons identified above performed spinal surgery on Medicare patients and each of those surgeons have billed Medicare or other government payors for their services in performing surgeries in which SpineFrontier devices have been used. Each of those claims for payment are false claims under the

30

FCA. In addition, each facility or hospital where such procedures were performed also submitted claims for payment to the United States in connection with the tainted procedures. Each of these claims for payment also constituted false claims under the FCA.

87. By paying illegal remuneration to the physicians who used SpineFrontier Devices, or by directing and facilitating such payments, KIC Ventures, Chin, IME, KICMG and SpineFrontier caused each and every one of the false claims described in the preceding paragraph.

88. As described above, each of the physicians identified above, and each of the institutions where the physician performed the surgical procedures that employed SpineFrontier devices, have certified to Medicare and other federal healthcare payors that they have not accepted kickbacks and that kickbacks did not induce or influence the services for which reimbursement were sought. Each one of these statements was false. As a result of making the payments described above, KIC Ventures, Chin, IME, SpineFrontier and KICMG caused the physicians and institutions to make such false statements and those statements caused the United States to pay numerous false claims.

89. The KIC Companies are controlled by Chin, and each of those companies, including KIC Ventures, IME, KICMG and SpineFrontier, for the reasons described above, have no corporate integrity. Any violation of the FCA by any of those entities is deemed to be the violation of the FCA by all of the entities and by Chin.

## VI. THE DEFENDANTS RETALIATE AGAINST THE RELATOR AFTER HE WARNS THEM THAT THE KICKBACK SCHEME IS ILLEGAL

90. Relator found all of these facts highly incriminating and was now more certain than ever that KIC Ventures, SpineFrontier, and IME were engaged in a fraudulent scheme which rewarded physicians with cash kickbacks for using SpineFrontier products.

91. Having uncovered significant evidence of an illegal kickback scheme, and having brought his concerns to both his immediate supervisor as well as his compliance officer to no avail, Relator took his concerns outside of the company.

92. On April 20, 2015, Relator contacted the Federal Bureau of Investigation ("FBI") and was directed to the FBI's Health Care Fraud division. Relator described the illegal kickback scheme he had discovered to an agent assigned to the FBI's Health Care Fraud division and had weekly conversations with the agent in which Relator provided information relating to the scheme.

93. On April 24th, an FBI agent and an FBI forensic accountant met Relator at AxioMed headquarters in Cleveland. Relator met secretly with the FBI agents and showed the agents payment sheets documenting money transfers from KIC Ventures to IME, as well as the corresponding payments from IME to physicians.

94. In early May 2015, Relator informed Theresa Schroeder that he had reported KIC Ventures, SpineFrontier, and IME to the FBI for engaging in illegal activity. Schroeder was upset with Relator and told him that an FBI investigation could lead to devastating consequences for AxioMed, as it was a subsidiary of KIC Ventures.

32

Relator told Schroeder that he was left with no other option as no one was willing to take any action to investigate the fraud.

95. On May 15, 2015, Relator had a private meeting with Lubinski at AxioMed's headquarters. Relator told Lubinski that the five to six figure "consulting fees" KIC Ventures and IME were paying surgeons for using SpineFrontier products may be illegal kickbacks. Relator expressed concern that Lubinski's career may be in serious jeopardy if he did not act on this information. Lubinski told Relator he would investigate Relator's claims, but he thought the legal department had made sure the payments were complying with all laws and regulations.

96. Approximately three weeks later, on the evening of Friday, June 5th, Relator received a phone call from Mike Barbin, SpineFrontier's Human Resources and Talent Acquisition Manager and Jake Lubinski, informing Relator that, effective immediately, he was being suspended with pay while they investigated employee complaints about his performance in the workplace. Barbin refused to describe the nature of the "employee complaints" which necessitated his suspension.

97. Relator's AxioMed email was immediately turned off, the security code to the building changed to prevent him from accessing the building, and he was told that his personal belongings would be returned to him. Relator also learned that all AxioMed employees were told not to contact him.

98. After the phone call, Relator also received a suspension letter dated June 5, 2015. The letter, signed by Jake Lubinski, confirmed that Relator was being suspended "due to [his] performance in the workplace." This vague statement in the suspension

letter was pretextual, was not supported with even one account of poor performance, and was directly contradicted by conversations Relator had with Jake Lubinski himself. Lubinski had repeatedly supported Relator's work decisions and approved of his management of AxioMed. Moreover, Lubinski had, on more than one occasion, told Relator that AxioMed CFO Aditya Humad and CEO Dr. Chin expressed confidence in Relator's ability to run AxioMed alone – even under the difficult circumstances AxioMed faced as an underfunded and understaffed company.

99. On June 8th at 4pm, Relator met with Lubinski and Barbin for less than 10 minutes at a Starbucks coffee shop. Barbin told Relator that he was going to interview all of AxioMed's employees to investigate the complaints that had allegedly been made against Relator and were purportedly the basis of Relator's suspension. Relator learned, however, that Barbin was scheduled to fly out of Ohio immediately following the meeting, and would not have had nearly enough time to interview anyone from AxioMed. Relator found the fact that Barbin had left Ohio without speaking to any AxioMed employees highly suspicious, and further supported Relator's belief that there was an ulterior motive behind his suspension.

100. Following his meeting with Barbin and Lubinski, Relator returned home and sent an email to Barbin, in which he expressed his concerns that KIC Ventures, IME and SpineFrontier were engaged in illegal activity. In his email, Relator described the evidence he had found to support his contentions, and asked Barbin if the two could speak privately.

34

101.    On June 10th Relator received a phone call from Mike Barbin and
SpineFrontier's General Counsel Paul Speidel, as well as outside counsel, Jeff Rogers.
Rather than discussing any "workplace performance" issues, Speidel, Barbin and
Rogers spent the entire phone call questioning Relator about how he had come to
discover the kickback scheme involving KIC Ventures, IME, and SpineFrontier.

102.    During the hour long phone conversation, Relator was asked repeatedly
whether or not he had gone to the FBI and, if so, what information had he provided to
the FBI. Relator was also asked if anyone else at AxioMed had given the FBI
information. Although Relator did reveal that he had reported his suspicions of illegal
kickbacks to the FBI, he did not discuss specifics during the phone call.

103.    The timing and nature of Relator's suspension, which coincided with
Relator contacting the FBI, coupled with the post-suspension conversations he had with
Barbin and Lubinski, leave little doubt that his suspension was retaliation for reporting
KIC Ventures, IME, and SpineFrontier's involvement in an illegal kickback scheme.

104.    For nearly four months after first learning of KIC Ventures/IME's
kickback scheme, Relator made numerous efforts to persuade management to take his
concerns seriously and to investigate his allegations. Relator voiced his concerns on
multiple occasions to his supervisor, Jake Lubinski, brought evidence of an illegal
kickback scheme to the attention of both AxioMed and SpineFrontier compliance
officers and whistleblower representatives, and even broached the subject of
compliance issues with Kingsley Chin. None of these individuals showed the least bit
concern for investigating Relator's claims. Relator finally felt compelled to report his

35

concerns of illegal activity to the FBI after AxioMed, SpineFrontier, and KIC Ventures management failed to acknowledge any of his concerns.

105.    By contacting the FBI, Relator was trying to do what was ethical and legal. Relator was acting to the letter of his employment agreement and "promot[ing] the interests of the Company" by trying to put a stop to illegal behavior that was undermining AxioMed's ability to attract investors. Shortly after contacting the FBI, retaliatory action was taken against the Relator on clearly pretextual grounds.

## COUNT ONE
### 31 U.S.C. § 3729(a)(1)(A)
### Causing the Presentation of False Claims
### (Against all Defendants Except AxioMed)

106.    The Relator incorporates each of the preceding paragraphs by reference as if set forth herein.

107.    Either with actual knowledge or in deliberate ignorance or reckless regard of the truth, Defendants Chin, SpineFrontier, KIC Ventures, IME, and KIC Management (together, the "FCA Defendants") presented or caused others to present false claims to the United States for payment from federal health care programs in violation of 31 U.S.C. § 3729(a)(1)(A). These claims were false claims because they were for services rendered to patients using SpineFrontier medical devices referred by Defendants in exchange for remuneration that was unlawful in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1).

108. As a result of FCA Defendants' misconduct, the United States has incurred damages through payment of false claims, including surgery services involving SpineFrontier medical devices.

109. FCA Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim they presented and caused to be presented for payment.

## COUNT TWO
### 31 U.S.C. § 3729(a)(1)(B)
### Causing False Statements Used in False Claim
### (Against all Defendants except AxioMed)

110. The Relator incorporates each of the preceding paragraphs by reference as if set forth herein.

111. Either with actual knowledge or in deliberate ignorance or reckless regard to the truth, FCA Defendants made and used false records and statements, including records and statements concerning their relationship with each other and the nature of payments made to physicians by IME, and caused others to make and use false statements, including certifications of compliance with United States statutes and Medicare and Medicaid regulations made by physicians that were material to false claims, both in violation of 31 U.S.C. § 3729(a)(1)(B).

112. The United States incurred damages because of FCA Defendants' misconduct in that, in reliance on the false records and statements that FCA Defendants

made and used and caused others to make and use, the United States paid false claims for services.

113. Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of \$5,500 to \$11,000 for each false record or statement committed by Defendants or that Defendants caused others to submit.

## COUNT THREE
## 31 U.S.C. § 3729(a)(1)(C)
## Conspiracy to Violate the False Claims Act
## (Against All Defendants Except AxioMed)

114. The Relator incorporates each of the preceding paragraphs by reference as if set forth herein.

115. FCA Defendants conspired with each other and others to violate the false claims and false statements provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B). 31 U.S.C. § 3729(a)(1)(C).

116. In disguising the source of funds used to pay kickbacks to physicians, Vanessa Dudley, the employee of IME, and Aditya Humad, the President and CFO of SpineFrontier, KIC Ventures and other companies owned by Chin, were also participants in the conspiracy. Also conspiring to disguise the source of kickbacks paid to physicians from those physicians and from the United States were many other companies set up and controlled by Chin that are not defendants in this action, including Kingsley Investment Company; Medinvus, LLC; INVUHoldings, LLC; LESSurgeons Institute Holdings, LLC; LESSurgeons Institute Florida, LLC; 1801 Sample

38

Road, LLC; SMB Investments, LLC; LES Pain Doc, LLC; Surgical Management and Billing, LLC; Modern Anesthesia Company, LLC; Modern Doctors, LLC f/k/a Doctors of Chiropractic Medicine; LESS Institute Clinical, PLLC; LES PAIN DOC, LLC; STRAPStherapy, PLLC; IMIS, LLC; and Society of Facet Surgical Techniques and Technologies, Inc.

117.    The false claims and false statements violations committed by FCA in the preceding paragraphs were made possible only through a conspiracy that violated 31 U.S.C. § 3729(a)(1)(C). The IME web site was staged as if IME were a consulting business, and IME was not registered in Florida, where it claimed on its web site to have a business address, or in Massachusetts, where Aditya Humad and others managed IME's bank account. Chin created new companies for the sole purpose of disguising his businesses' relationships with each other. And in the conspiracy to pay kickbacks to physicians for the purchase of SpineFrontier medical devices, SpineFrontier, KIC Ventures, IME, KIC Management, Chin, Aditya Humad, and Vanessa Dudley all played essential roles.

118.    The United States incurred damages because of the FCA Defendants' conspiracy to violate other provisions of the False Claims Act in that those violations caused the United States to incur damages, as set forth in the preceding paragraphs.

119.    FCA Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for all harm to the United States caused by the FCA Defendants' conspiracy to violate the False Claims Act.

39

## COUNT FOUR
## VIOLATION OF 31 U.S.C. § 3730(h)
## (Against AxioMed)

120.    Relator repeats and realleges each of the allegations set forth in the preceding paragraphs as though set forth herein.

121.    Relator was engaged in conduct protected by the anti-retaliation provision of the federal False Claims Act, 31 U.S.C. § 3730(h)(1), because he was an AxioMed LLC employee, and because of his efforts to stop AxioMed's parent corporation, KIC Ventures, and sister corporations IME and SpineFrontier, from engaging in practices of paying physicians illegal remuneration in exchange for physicians agreeing to use SpineFrontier devices in surgeries. Because KIC Ventures, IME and SpineFrontier were engaged in conduct that was violative of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Relator's efforts to stop Defendants' illegal kickback scheme were efforts to stop violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)-(C).

122.    AxioMed was aware that Relator was engaged in protected activity because the protected activity itself made officers of AxioMed aware of it. Relator made efforts to stop Defendants' conduct by voicing concerns to several AxioMed/SpineFrontier/KIC Ventures officials. Relator did so by sending an email to Kingsley Chin, the founder and CEO of Defendant corporations, and Aditya Humad CFO of Defendant corporations, informing them that Relator had received information that Defendants' were failing to comply with regulations. Relator did so again by having multiple conversations with his supervisor AxioMed President/SpineFrontier COO Jake Lubinski, in which Relator expressed concern regarding the legality of

40

"consulting fees" being paid to physicians. Relator did so again by raising his concerns

to Theresa Schroeder, AxioMed's acting compliance officer. When none of these

individuals took action, Relator finally reported the illegal kickback scheme to the FBI's

health care fraud division.

123.   Defendants retaliated against Relator because of his protected conduct,

which, right before he was suspended had demonstrated to Defendants that Relator

was certain of his concerns, that he was willing to go outside the company to address

them, and that he was willing to persist in his efforts to stop violative practices despite

being summarily ignored by company officials.

124.   Defendants' retaliatory conduct, prohibited by 31 U.S.C. § 3730(h)(1),

included Relator's suspension. As a result of Defendants' wrongful retaliatory conduct,

Relator has suffered substantial emotional distress.

## COUNT ONE
## 31 U.S.C. § 3729(a)(1)(A)
## False Claims

125.   The Relator incorporates each of the preceding paragraphs by reference as

if set forth herein.

126.   Either with actual knowledge or in deliberate ignorance or reckless regard

of the truth, Defendants Chin, SpineFrontier, KIC Ventures, IME, and KIC Management

(together, the "FCA Defendants") presented or caused others to present false claims to

the United States for payment from federal health care programs in violation of 31

U.S.C. § 3729(a)(1)(A). These claims were false claims because they were for services

41

rendered to patients using SpineFrontier medical devices referred by Defendants in exchange for remuneration that was unlawful in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1).

127. As a result of FCA Defendants' misconduct, the United States has incurred damages through payment of false claims, including surgery services involving SpineFrontier medical devices.

128. FCA Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim they presented and caused to be presented for payment.

## COUNT TWO
### 31 U.S.C. § 3729(a)(1)(B)
### False Statements

129. The Relator incorporates each of the preceding paragraphs by reference as if set forth herein.

130. Either with actual knowledge or in deliberate ignorance or reckless regard to the truth, FCA Defendants made and used false records and statements, including records and statements concerning their relationship with each other and the nature of payments made to physicians by IME, and caused others to make and use false statements, including certifications of compliance with United States statutes and Medicare and Medicaid regulations made by physicians that were material to false claims, both in violation of 31 U.S.C. § 3729(a)(1)(B).

42

131. The United States incurred damages because of FCA Defendants'

misconduct in that, in reliance on the false records and statements that FCA Defendants

made and used and caused others to make and use, the United States paid false claims

for services.

132. Defendants are jointly and severally liable to the United States under the

False Claims Act for treble damages, in an amount to be determined at trial, plus a civil

penalty of $5,500 to $11,000 for each false record or statement committed by Defendants

or that Defendants caused others to submit.

## COUNT THREE
### 31 U.S.C. § 3729(a)(1)(C)
### Conspiracy to Violate the False Claims Act

133. The Relator incorporates each of the preceding paragraphs by reference as

if set forth herein.

134. FCA Defendants conspired with each other and others to violate the false

claims and false statements provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

and (B). 31 U.S.C. § 3729(a)(1)(C).

135. In disguising the source of funds used to pay kickbacks to physicians,

Vanessa Dudley, the employee of IME, and Aditya Humad, the President and CFO of

SpineFrontier, KIC Ventures and other companies owned by Chin, were also

participants in the conspiracy. Also conspiring to disguise the source of kickbacks paid

to physicians from those physicians and from the United States were many other

companies set up and controlled by Chin that are not defendants in this action,

including Kingsley Investment Company; Medinvus, LLC; INVUHoldings, LLC;

LESSurgeons Institute Holdings, LLC; LESSurgeons Institute Florida, LLC; 1801 Sample Road, LLC; SMB Investments, LLC; LES Pain Doc, LLC; Surgical Management and Billing, LLC; Modern Anesthesia Company, LLC; Modern Doctors, LLC f/k/a Doctors of Chiropractic Medicine; LESS Institute Clinical, PLLC; LES PAIN DOC, LLC; STRAPStherapy, PLLC; IMIS, LLC; and Society of Facet Surgical Techniques and Technologies, Inc.

136. The false claims and false statements violations committed by FCA in the preceding paragraphs were made possible only through a conspiracy that violated 31 U.S.C. § 3729(a)(1)(C). The IME web site was staged as if IME were a consulting business, and IME was not registered in Florida, where it claimed on its web site to have a business address, or in Massachusetts, where Aditya Humad and others managed IME's bank account. Chin created new companies for the sole purpose of disguising his businesses' relationships with each other. And in the conspiracy to pay kickbacks to physicians for the purchase of SpineFrontier medical devices, SpineFrontier, KIC Ventures, IME, KIC Management, Chin, Aditya Humad, and Vanessa Dudley all played essential roles.

137. The United States incurred damages because of the FCA Defendants' conspiracy to violate other provisions of the False Claims Act in that those violations caused the United States to incur damages, as set forth in the preceding paragraphs.

138. FCA Defendants are jointly and severally liable to the United States under the False Claims Act for treble damages, in an amount to be determined at trial, plus a

civil penalty of \$5,500 to \$11,000 for all harm to the United States caused by the FCA Defendants' conspiracy to violate the False Claims Act.

## COUNT FOUR
## 31 U.S.C. § 3730(h)
## Retaliation

139.    Relator repeats and realleges each of the allegations set forth in the preceding paragraphs as though set forth herein.

140.    Relator was engaged in conduct protected by the anti-retaliation provision of the federal False Claims Act, 31 U.S.C. § 3730(h)(1), because he was an AxioMed LLC employee, and because of his efforts to stop the FCA Defendants from engaging in practices of paying physicians illegal remuneration in exchange for physicians agreeing to use SpineFrontier devices in surgeries. Because the FCA Defendants were engaged in conduct that was violative of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Relator's efforts to stop such conduct were efforts to stop violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)-(C), and were in furtherance of an action under the False Claims Act.

141.    AxioMed was aware that Relator was engaged in protected activity because the protected activity itself made officers of the FCA Defendants aware of it. Relator made efforts to stop the FCA Defendants' conduct by voicing concerns to officers of the KIC Companies, including by email to Kingsley Chin and Aditya Humad. The Relator informed them he had received information that the FCA Defendants were failing to comply with regulations. Relator did so again by having multiple conversations with his supervisor AxioMed President/SpineFrontier COO Jake

Lubinski, in which Relator expressed concern regarding the legality of "consulting fees" being paid to physicians. Relator did so again by raising his concerns to Theresa Schroeder, AxioMed's acting compliance officer. When none of these individuals took action, Relator finally reported the illegal kickback scheme to the FBI's health care fraud division.

142. Defendants retaliated against Relator because of his protected conduct, which, right before he was suspended had demonstrated to Defendants that Relator was certain of his concerns, that he was willing to go outside the company to address them, and that he was willing to persist in his efforts to stop violative practices despite being summarily ignored by company officials.

143. Defendants' retaliatory conduct, prohibited by 31 U.S.C. § 3730(h)(1), included Relator's suspension. As a result of Defendants' wrongful retaliatory conduct, Relator has suffered substantial emotional distress.

WHEREFORE, the Relator, on his own behalf and pursuant to 31 U.S.C. § 3729 *et seq.*, requests that this Court:

> (a) Enter judgment holding Kingsley Chin, KIC Ventures, LLC, SpineFrontier, Inc., Impartial Medical Experts, LLC, and KIC Management Group, Inc. liable for a civil penalty of $11,000 for each violation of the False Claims Act committed by the conspiracy;
>
> (b) Enter judgment against Kingsley Chin, KIC Ventures, LLC, SpineFrontier, Inc., Impartial Medical Experts, LLC, and KIC

Management Group, Inc. for three times the amount of damages

sustained by the United States because of the acts of the conspiracy;

(c) Award the Relator a percentage of the proceeds of the action in

accordance with 31 U.S.C. § 3730;

(d) Reinstate Relator with the same seniority status that he would have

had but for the wrongful retaliation;

(e) Award Relator compensation for all special damages he has sustained

as a result of unlawful retaliation;

(f) Award the Relator his costs and reasonable attorney's fees for

prosecuting this action; and

(g) Enter such other relief which the Court finds just and equitable.

Dated: July 1, 2015                    ___ /s/ Thomas M. Greene _____

Thomas M. Greene (BBO #210020)
tgreene@greenellp.com
Michael Tabb (BBO #491310)
matabb@greenellp.com
Ryan P. Morrison (BBO #680238)
rmorrison@greenellp.com
Tucker D. Greene (BBO #682943)
tucker.greene@greenellp.com
**GREENE**ᴸᴸᴾ
One Liberty Square, Suite 1200
Boston, MA 02109
(617) 261-0040