**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel*. CHARLES BIRCHALL, Jr., JOHN MILLER, and WALTER BENNETT, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) |
| | ) |
| SPINEFRONTIER, INC.; IMPARTIAL MEDICAL EXPERT, LLC; KIC MANAGEMENT GROUP, INC.; KICVENTURES, LLC; KINGSLEY R. CHIN, M.D.; ADITYA HUMAN; and VANESSA DUDLEY, | ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) ) ) ) |

**No. 1:15-cv-12877-LTS**

**No. 1:15-cv-12908-LTS**

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**RELATORS' JOINT MOTION FOR RELATOR AWARD**

---

**Table of Contents**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 3

    A.   Relators' Allegations ............................................................................................ 3

    B.   Government's Settlement with Settling Surgeons ............................................. 7

ARGUMENT ...................................................................................................................... 9

    A.   Relators are entitled to an award from all proceeds of the action or settlement of the claims. ..................................................................................................................... 9

    B.   The Government's recovery from the Settling Surgeons also constitutes an alternate remedy, from which Relators have the same rights to an award. ........................................ 13

    C.   Awarding Relators a portion of the Government's recovery from the Settling Surgeons promotes the focal policy objectives of the False Claims Act. ........................................... 16

CONCLUSION .................................................................................................................. 19

## MEMORANDUM OF LAW IN SUPPORT OF RELATORS' JOINT MOTION FOR RELATOR AWARD

### INTRODUCTION

Relators Charles Birchall, Jr., John Miller, and Walter Bennett (collectively, "Relators"), hereby move, based upon this memorandum of law, for an order declaring that they are entitled to a relator award, pursuant to 31 U.S.C. § 3730(d)(1) and/or 31 U.S.C. § 3730(c)(5), from the Government's recovery of settlement proceeds obtained from Jeffrey Carlson, Paul DeGenova, Michael Murray, Joseph Shahadi, Agha Khan, and John Atwater (collectively, the "Settling Surgeons").

Relators filed *qui tam* complaints under seal on July 1 and 15, 2015, respectively, each describing, in extensive detail, an illegal kickback scheme in contravention of the Anti-Kickback Statute ("AKS") and False Claims Act ("FCA"). The mechanics of the *quid pro quo* scheme, as alleged by Relators, were straightforward—spine surgery device manufacturer SpineFrontier, Inc. ("SpineFrontier"), and several related entities and individuals in an extensive conspiracy, made kickback payments to surgeons and, in an effort to disguise those kickbacks, habitually funneled payments through Impartial Medical Experts, LLC ("IME"), a sham consulting company set up for that sole purpose. Although Relators did not name the Settling Surgeons as party-defendants in their original complaints,[1] nowhere under the FCA were they required to do so and, in any event, they indisputably provided the Government with a road map to the fraud. The Relators' complaints not only identified each of the Settling Surgeons by name, but also provided the dates payments were made to kickback recipients and the dollar amounts of the payments. The Relators'

---

[1] Out of caution and consistent with Rule 15(a) of the Federal Rules of Civil Procedure, Relators Miller and Bennett filed an Amended Complaint on August 10, 2022 (ECF 112), naming the Settling Surgeons and others as additional defendants. See infra at 16-17.

complaints clearly alerted the Government to the Settling Surgeons' unambiguous involvement in the illicit kickback scheme.

After five years of investigation, on March 5, 2020, the United States formally intervened in both *qui tam* matters by filing a Complaint in Intervention (ECF 58)[2] against defendants the Relators had named in their complaints, including SpineFrontier, IME, KIC Management Group, Inc., KICVentures, Kingsley Chin, Aditya Humad, and Vanessa Dudley.  Simultaneously, the U.S. Attorney's Office for the District of Massachusetts, announced, to Relators' surprise, that the Government had unilaterally settled civil healthcare fraud claims, for a combined recovery of $1,557,064, against five of the six Settling Surgeons—Drs. DeGenova, Murray, Shehadi, Khan, and Atwater.  Each of the doctors admitted to receiving kickbacks from SpineFrontier, funneled through IME, for consulting work not performed (i.e., the precise scheme and parties that Relators previously disclosed to the Government in detail).  Subsequently, on April 24, 2020, the U.S. Attorney's Office for the District of Massachusetts announced that a sixth Settling Surgeon previously identified in Relators' complaints, Dr. Jeffrey R. Carlson, agreed to pay $1.75 million to resolve allegations that he accepted kickbacks from SpineFrontier, also in the form of sham consulting fees submitted through IME.

The kickback scheme which resulted in the Government's recovery of $3,307,064 from the Settling Surgeons was unassailably identified in the Relators' complaints.  The Government had no prior knowledge that the Settling Surgeons accepted kickbacks, nor would it have had such knowledge but for the complaints filed by Relators.  Indeed, the Government has acknowledged that all these settlements resulted from its investigation of the kickback allegations the Relators

---

[2] Unless otherwise specified, all ECF entries reference the *Birchall* docket, No. 1:15-cv-12877. All references to the *Miller*/*Bennett* docket are reflected as "MB ECF."

brought to the Government's attention through their qui tam complaints.  These recoveries directly trace back to the conduct alleged with particularity by Relators.

Notwithstanding, the Government takes the position that Relators are not entitled to an award from the proceeds of the settlements because the Settling Surgeons were not named as defendants in the *qui tam* complaints.  As explained herein, the FCA and corresponding case law provide no basis for the Government's refusal to award Relators an award on this basis.  To the contrary, the limited available case law is plainly supportive of Relators' entitlement to an award under these circumstances.  Moreover, by deliberately choosing to settle with kickback participants who are jointly liable for the damages the United States suffered as a result of fraud scheme identified by the Relators, 31 U.S.C. §3730(c)(5), the FCA's "alternate remedy" provision, requires the United States to pay an award on the alternative remedy the Government chose to pursue. Awarding Relators a portion of the Government's recovery from the Settling Surgeons is just, equitable, and undoubtedly promotes the focal policy objectives permeating the FCA.

## FACTUAL BACKGROUND

### A.  Relators' Allegations

Relators filed *qui tam* complaints on July 1 and 15, 2015, respectively, each articulating, in extensive detail, an illegal kickback scheme in contravention of the AKS and FCA.  Both complaints alleged that in order to induce spine surgeons to use techniques and devices he had created, Kingsley Chin—the spine surgeon who founded SpineFrontier—initiated a scheme to pay substantial amounts to the surgeons who used his company's devices in their surgeries.  Chin created a "consulting" company, IME, which supposedly provided medical consulting and expert witness services.  Surgeons who used SpineFrontier products could sign up with IME to be paid to "evaluate" SpineFrontier's medical devices.  The evaluations were shams. No real critique was

involved and SpineFrontier had no need for its customers to keep evaluating the same devices they were regularly using in their surgeries. The payments the "consultants" received were not proportional to the time the consultants actually expended, and the amount paid to the surgeons far exceeded the fair market value of what SpineFrontier received. Some surgeons, including two of the Settling Surgeons (DeGenova and Carlson) received tens of thousands of dollars for a few weeks of "consulting." IME was also a sham. It had no actual customers, and it was simply used as a conduit to transfer payments from SpineFrontier to the surgeons who used SpineFrontier products. *See* Birchall Complaint, ECF 1, ¶¶ 75, 77 -78, 81 and 83; Miller/Bennett Complaint, MB ECF 1, ¶¶ 32-35, 106 and 107.

In regard to the Settling Surgeons, Relators' complaints, including the exhibits to their complaints, definitively described the six surgeons' involvement in the kickback scheme in contravention of the AKS and FCA. The Relator's complaints provided the following information regarding each Settling Surgeon:

**DeGenova:** Both complaints contained specific allegations relating to kickbacks paid to Dr. DeGenova, including the dates and amounts of the payments. Paragraph 83 of the Birchall Complaint alleges:

> Dr. Francis Paul Degenova also received kickbacks for SpineFrontier business. Dr. Degenova's practice, Sports Medicine Grant, Inc., is at 323 E Town St., Columbus, OH. He received five kickbacks between January 31 and April 15, 2015, of $43,700, $13,300, $19,950, $14,725, and $18,525, for a total of $110,200 in kickbacks in less than three months. On information and belief, Dr. Degenova has also received kickbacks in other time periods, as well.

ECF 1. Paragraph 107 of the Miller/Bennett Complaint alleges:

> Dr. F. Paul DeGenova, an orthopedic surgeon located in Columbus, Ohio, received, as an IME Consultant, various forms of remuneration by Defendants, including consulting fees, as discussed above. As a direct and intended result of Defendants' kickback scheme, Dr. DeGenova has used a SpineFrontier medical device product while performing at least one surgery for which he sought and received Medicare

reimbursement.  In 2012, he billed Medicare for 69 procedures involving several HCPCS codes assigned to SpineFrontier's medical devices (22612, 22840, and 22851), and for which he sought $170,858.00 in Medicare reimbursements, and received $49,981.55 in such reimbursements.  See Exhibit D.  In 2013, he billed Medicare for 70 procedures involving HCPCS codes assigned to SpineFrontier medical devices (22612, 22840, 22851), and for which he sought $159,152.00 in Medicare reimbursements, and received $44,521.00 in such reimbursements.  See Exhibit E.

MB ECF 1. *See also,* ¶ 46. Both complaints also attached exhibits documenting the payments Dr.

Genova received.  ECF 1, Exhibit 1; MB ECF 1, Exhibit B.

**Carlson:**  Both complaints contained specific allegations relating to kickbacks paid to Dr.

DeGenova, including the dates and amounts of the payments.  Paragraph 81 of the Birchall

Complaint alleges:

One of the surgeons who received kickbacks was Jeffrey Carlson, who practices at 250 Nat Turner Boulevard, Newport News, VA. Dr. Carlson has Medicare and Medicaid patients, and continues to accept new Medicare patients.  Between February 28 and April 17 of this year, 2015, Dr. Carlson received payments of $16,150, $23,750 and $16,150 from IME, and a payment of $13,300 from KICMG. In total, he received $57,350 in just that seven week period as kickbacks for his use of SpineFrontier devices.  On information and belief, Dr. Carlson has received kickbacks in other time periods, as well.

ECF.  Paragraph 106 of the Miller/Bennett Complaint alleges:.

As part of the kickback scheme discussed above, health care providers who worked as IME Consultants for Defendants entered into such Provider Agreements, pursuant to which each provider was induced to submit at least one false claim to the Medicare Program for performing surgical procedures involving SpineFrontier's medical devices, and that was paid for by Medicare.  For example, Dr. Jeffrey Carlson, an orthopedic surgeon located in Newport News, Virginia, received, as an IME Consultant, various forms of remuneration by Defendants, including consulting fees, as discussed above.  As a direct and intended result of Defendants' kickback scheme, Dr. Carlson has used a SpineFrontier medical device product while performing at least one surgery for which he sought and received Medicare reimbursement.  In 2012, for example, he billed Medicare for 52 procedures involving an HCPCS code assigned to SpineFrontier medical devices (22612), and for which he sought $291,564.00 in Medicare reimbursements, and received $52,151.75 in such reimbursements.  See Exhibit D.  In 2013, he billed Medicare for 86 procedures involving HCPCS codes assigned to SpineFrontier

medical devices (22612, 22851), and for which he sought $400,042.00 in Medicare reimbursements, and received $73,441.81 in such reimbursements.  See Exhibit E.

MB ECF 1.  Both complaints also attached exhibits documenting the payments Dr. Genova received.  ECF 1, Exhibit 1; MB ECF 1, Exhibit B.

**Murray:**   Relators Birchall and Miller/Bennett each provided attachments to their respective complaints identifying payments made to Dr. Murray, along with dates and amounts for those payments. ECF 1, Exhibit 1; MB ECF 1, Exhibit B.

**Shehadi:**   Relators Miller/Bennett document Dr. Shehadi as being an important IME Consultant as well as an important customer of SpineFrontier. MB ECF 1, at ¶ 36 and Exhibits A, C and F.

**Khan**:   Relators Miller/Bennett document Dr. Shehadi as being an important IME Consultant as well as an important customer of SpineFrontier. MB ECF 1, Exhibits A, C and F.

**Atwater:**   Relators Miller/Bennett document Dr. Atwater as being an important IME Consultant as well as an important customer of SpineFrontier. MB ECF 1, ¶ 43[3], and Exhibits A, C and F.

---

[3] In Paragraph 43 of their complaint, Miller and Bennett allege:

In a September 2, 2014 email from Aditya Humad, the Chief Financial Officer of SpineFrontier, to Dr. Chin, Humad notes that a physician's organization, Your Extra Hands Surgical Services ("YEHSS"), located in Normal, Illinois, "receives $3,200 per month as management fee for [SpineFrontier sales] rep (Sid covering Dr. Atwater). Sid receives $2,500 per month for coverage. Total of $5,800 per month, but Dr. Atwater has been doing 1-2 cases per month for $10-15K/month. With Dr. Atwater moving to FL, this will drop further." Another physician wants to replace Dr. Atwater and "is adamant on current arrangement, but I cannot justify the numbers given the low sales volume.

Given that there have been no other actions filed prior to or after the instant matters that allege facts relating to the SpineFrontier kickback scheme (nor has the Government notified Relators through counsel of any independent prior knowledge on the part of the Government concerning the scheme), it is beyond question that Relators are the original source for the information underlying the Government's recoveries from the Settling Surgeons and that the conduct giving rise to the Surgeon Settlements is one and the same with and traced directly back to the conduct alleged with particularity by Relators.

On August 10, 2022, following the Government's notice to Relators' counsel of its position denying Relators' entitlement to a relator's share of the Surgeons Settlements, and consistent with the Federal Rules of Civil Procedure, Relators Miller and Bennett filed an Amended Complaint (MB ECF 112), naming the Settling Surgeons and others as additional defendants.

**B. Government's Settlement with Settling Surgeons**

On March 5, 2020, the U.S. Attorney's Office for the District of Massachusetts announced the Government's intervention in Relators' two respective *qui tam* lawsuits—*United States ex rel. Birchall v. SpineFrontier, Inc. et al.*, No. 15-cv-12877, and *U.S. ex rel. Miller & Bennett v. SpineFrontier, Inc. et al.*, No. 15-cv-12908—and filed a complaint in intervention naming multiple Defendants, including SpineFrontier, IME, KIC Management Group, Inc., KICVentures, Kingsley Chin, Aditya Humad, and Vanessa Dudley.

Simultaneously, on March 5, 2020, the U.S. Attorney's Office for the District of Massachusetts announced that the Government had settled civil healthcare fraud claims, for a combined recovery of $1,557,064, against five of the six Settling Surgeons, i.e., Dr. F. Paul

DeGenova, Dr. Michael Murray, Dr. Joseph Shehadi, Dr. Agha Khan, and Dr. John Atwater,[4] each of whom admitted to receiving kickbacks from SpineFrontier, funneled through IME, for consulting work not performed.  In the March 5, 2020 Press Release, the Office noted that each of the five Settling Surgeons cooperated with the Government's investigation into the defendants affiliated with SpineFrontier, which was taken into account in the settlements.  It's incontestable that the settlements are directly attributable to the information provided in Relators' 2015 complaints, which described the kickback scheme and these surgeons' involvement with particularity, including identification of specific payments made to these surgeons, along with dates and amounts for those payments. *See, e.g.,* ECF 1, ¶¶ 75, 77, 78, 83, and Exhibit 1; MB ECF 1, ¶¶ 32-35, 36, 43,107, and Exhibits A, C, D, E and F.

On April 24, 2020, the U.S. Attorney's Office for the District of Massachusetts announced that a sixth Settling Surgeon, Dr. Jeffrey R. Carlson, agreed to pay $1.75 million to resolve allegations that he accepted kickbacks from SpineFrontier, also in the form of sham consulting fees submitted through IME.[5] Relators' 2015 complaints were equally the source of the Government's detection of Dr. Carlson's participation in the SpineFrontier kickback scheme, detailing to the Government the mechanics of the kickback scheme, Dr. Carlson's involvement therein, payments made to Dr. Carlson, and dates and amounts for those payments. *See, e.g.,* ECF 1, ¶ 81; MB ECF 1, ¶ 106 and Exhibits A, C, D, E and F.

---

[4] Press Release, United States Attorney's Office, District of Massachusetts, *U.S. Attorney Sues Spinal Device Company and Its Executives for Allegations that they Paid Kickbacks to Surgeons* (March 5, 2020), available at: https://www.justice.gov/usao-ma/pr/us-attorney-sues-spinal-device-company-and-its-executives-allegations-they-paid-kickbacks.

[5] Press Release, United States Attorney's Office, District of Massachusetts, *Surgeon Agrees to Pay $1.75 Million to Resolve Allegations that He Accepted Kickbacks from SpineFrontier* (April 24, 2020), available at: https://www.justice.gov/usao-ma/pr/surgeon-agrees-pay-175-million-resolve-allegations-he-accepted-kickbacks-spinefrontier.

Thus, the United States has now recovered from the Settling Surgeons $3,307,064, for their participation in (expressly noting the surgeons' cooperation in their investigation of) the same SpineFrontier kickback scheme pled with particularity by Relators and directly traceable to the original information provided by Relators.

## ARGUMENT

**A. Relators are entitled to an award from all proceeds of the action or settlement of the claims.**

The False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, is meant to be an "expansive" statute, interpreted broadly and "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

The FCA empowers a private person, known as a "relator," having information regarding a false or fraudulent claim against the Government to bring an action on the Government's behalf. 31 U.S.C. § 3730.  As an incentive for exposing fraud impacting the Government, the relator is entitled to an award; *i.e.*, to share in the proceeds of the successful prosecution of the fraud.  If the Government elects to proceed with an action brought by a relator (*i.e.*, if the Government intervenes), the relator is generally entitled to "receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d)(1).

Essentially, Congress intended that 15 percent act as a bare-minimum "finder's fee" to incentivize relators to come forward, and that an award is payable "even if [the relator] does nothing more than file the action in federal court." 132 Cong. Rec. H9382-03 (Oct. 7, 1986) (statement of Rep. Berman).  Moreover, it was Congress' intent to encourage private citizens to

bring fraud perpetrated against the Government to the Government's attention, and "[i]t emphasized its belief that '[i]n the face of sophisticated and widespread fraud…only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds." *U.S. ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 648 (6th Cir. 2003) (citing S. Rep. 99-345, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5267.).

In *United States v. Najjar*, 120 F.Supp.3d 1322 (M.D. Fla. 2015), a case with facts strikingly similar to those present here, the District Court determined that a FCA relator was entitled to a relator award under 31 U.S.C. § 3730(d)(1) where, although he did not name the party as a defendant, he included all material information needed to assert a claim against that defendant, such as the role played in the scheme.  In *Najjar*, the relator discovered that two brothers—Samir Najjar and Lee Najjar—were engaged in a fraudulent scheme, and subsequently filed a *qui tam* lawsuit under the FCA detailing the misconduct by both brothers.  However, the relator only named one of the brothers, Samir, as a defendant in the complaint.  Eventually, the Government, Samir, and the relator entered into a settlement, wherein the relator was entitled to a share of any money collected from Samir.  The Government also entered into a separate settlement agreement with Lee, but contended that the relator was not entitled to an award from that settlement because the relator had not named Lee in his qui tam action. *Id.* at 1323-24.

Acknowledging the question to be of first impression within the Eleventh Circuit, the Court determined that "the relator's complaint must be evaluated on a claim-by-claim basis to determine whether he or she is entitled to a share of any settlement." *Id.* at 1325.  Characterizing it as "a close question," the Court found that "the purposes behind the [FCA] counsel in favor of an award" to the relator. *Id.* at 1326.  In determining that a relator is entitled to an award for recovery through an unnamed defendant, the *Najjar* Court emphasized that the relator identified the unnamed

defendant, described his participation in the scheme, and brought the full extent of the unnamed defendant's fraudulent conduct to the Government's attention. *Id.*  In light of the primary purpose of the FCA—to encourage whistleblowers to come forward with allegations of fraud perpetrated upon the government and to reward them when they do so—and because the relator "acted in accord with the purpose of the FCA," the Court concluded that the relator was entitled to an award from settlement proceeds derived by the Government from a party not named in the *qui tam* complaint. [6]

This case is doctrinally and factually akin to *Najjar*, Relators' complaints, and cooperation in the investigation provided the Government with a comprehensive and precise road map to the kickback scheme.  Relators identified each of the Settling Surgeons by name, and provided specific

---

[6] Although no longer entitled to precedential weight, the Eighth Circuit's panel decision in *Rille v. PricewaterhouseCoopers LLP*, 748 F.3d 818, 824-26 (8th Cir. 2014), *vacated*, 2014 WL 5835458 (8th Cir. Aug. 27, 2014), *rev'd en banc*, 803 F.3d 368 (8th Cir. 2015) ("*Rille I*") supports the Relators' position. In *Rille I* the Government argued that the relators were not entitled to an award unless the settling defendant was explicitly named in the relators' complaint, the absence of which would render the complaint deficient under Rule 9(b)'s pleading standard with respect to the unnamed defendant. In rejecting the Government's argument, the Eighth Circuit determined that the relators were entitled to an award from the proceeds derived from a defendant not named in their complaint, because Rule 9(b)'s pleading standards are not relevant to whether a relator is entitled a statutory share of a *qui tam* recovery, the settlement amount paid by the defendant arose out of the action relators originally brought, and the Government reached a settlement involving the same fraudulent practices first identified by the relators. The Court further noted that awarding the relators under such circumstances is consistent with the "primary purpose of the FCA [] to encourage whistleblowers to come forward with allegations of fraud perpetrated upon the government, and to reward them when they do so," "and it would defeat such purpose if the relators were not rewarded accordingly." *Id.*

Sitting *en banc,* the Eighth Circuit subsequently vacated *Rille I* because the full court found there was an insufficient factual overlap between claim brought by the relator's complaint and the case the government ultimately settled. 803 F.3d 368 (8th Cir. 2015). The *en banc* decision did not review the panel's analysis regarding when a relator is entitled to a share of settlement proceeds from a responsible party not named as a defendant in the relator's complaint. Here there is no question that there is factual overlap between the claims in the Relators' complaints and the settled claims against the Settling Surgeons.

allegations, including amounts and dates of payments made and citations to specific communications, and clearly described (and alerted the Government to) the Settling Surgeons' definite involvement in the illicit kickback scheme.  The kickback scheme through which the Government recovered $3,307,064 from the Settling Surgeons was squarely identical to that articulated by Relators.  The Government had no prior knowledge of the scheme, nor would it have had such knowledge, but for the complaints filed by Relators.  It is beyond reasonable dispute that Relators were the original source for the information underlying the Government's recoveries from the Settling Surgeons, and similarly indisputable that the conduct giving rise to the Surgeon Settlements is one and the same with and traced directly back to the conduct alleged with particularity by Relators.

Additionally, but not necessarily, as noted above, on August 10, 2022, Relators Miller and Bennett filed an Amended Complaint (MB ECF 112) as permitted by Federal Rule of Civil Procedure 15(a) (allowing a party to amend a pleading once as a matter of course any time within twenty-one days after the complaint is served), naming the Settling Surgeons and others as additional defendants.  This is significant in that an omission of a defendant in a complaint is generally cured by an amended complaint, enabling the relator to share in the Government's recovery from that defendant.  *See United States v. Bisig*, No. 100-cv-335 (JDT), 2005 WL 3532554, at *7 (S.D. Ind. Dec. 21, 2005).

In *Bisig*, the relator named a business entity as a defendant in its *qui tam* action but failed to also name the owner/operator of the entity as a defendant.  No. 100-cv-335 (JDT), 2005 WL 3532554, at *7. Consequently, the Government contended that the relator's omission of the owner/operator as a defendant in the *qui tam* complaint precluded the relator's recovery of a corresponding award.  In rejecting the Government's position, the Court noted the relator's ability

to amend its complaint in a manner consistent with Federal Rule of Civil Procedure 15(a), stating that the relator's amendment naming the additional party as a defendant was proper and secured the relator's share of the recovery from the unnamed defendant. *Id.* ("Indeed, these types of omissions are generally cured by an amended complaint.").

The FCA and corresponding case law provide no basis for the Government's refusal to award Relators a share of the recoveries from the Settling Surgeons not named in Relators' initial complaints. To the contrary, the limited available case law is plainly supportive of Relators' entitlement to an award under these circumstances.

**B. The Government's recovery from the Settling Surgeons also constitutes an alternate remedy, from which Relators have the same rights to an award.**

Relators are equally entitled to the incentive award promised by the FCA under 31 U.S.C. § 3730(c)(5)—the "alternate remedy" provision—which provides, in pertinent part:

> Notwithstanding subsection (b) [authorizes *qui tam* action by private persons], the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section.

Relators retain their rights under the FCA when the Government pursues an alternate remedy with respect to their claims. "If the government pursues an alternate remedy, one of the rights to which the relator is entitled is the right to obtain a share of the proceeds of the action or settlement of the claim."[7] *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 892 F.Supp.2d 341,

---

[7] In addition, if the alternate remedy is a settlement, the relator also has a right to have the court determine, after a hearing, whether the proposed settlement is fair, adequate, and reasonable under all the circumstances, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 892 F.Supp.2d at 343 (citing 31 U.S.C. § 3730(c)(2)(B), and *U.S. ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191 (4th Cir. 1999)). If the relator believes that the Government acted improperly in

343 (D. Mass. 2012) (citing 31 U.S.C. § 3730(d)(1), and *U.S. ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 649 (6th Cir. 2003)).

An "alternate remedy" refers to the Government's pursuit of a relator's claim through any alternative to intervention, such as through settlement pursued by the government in lieu of intervening in the relator's *qui tam* claim. *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 892 F.Supp.2d at 343-44 (citing *Bledsoe*, 342 F.3d at 647-49). If the Government has recovered funds lost to it from conduct asserted in a relator's valid *qui tam* action, then the Government has essentially settled the relator's claims, regardless of whether the Government has formally intervened in the relator's action. *Bledsoe*, 342 F.3d at 649. Through the alternate remedy provision, "[t]he FCA provides that a relator is entitled to 15-25% of the proceeds when the government has settled claims *stemming from* a relator's valid *qui tam* suit." *Id.* (emphasis added); *see also Bisig*, No. 100-cv-335 (JDT), 2005 WL 3532554, at *4 ("Thus, the Court holds in this case that because the United States has achieved a monetary recovery from the Defendant in a manner outside of the *qui tam* action, and that recovery made an actual monetary recovery by the relator in the *qui tam* action either impossible or futile, the United States, in effect, elected to pursue its claim through an alternate remedy under § 3730(c)(5).").

In *Bledsoe*, the Sixth Circuit Court of Appeals determined that a certain settlement agreement between the Government and a healthcare provider constituted an "alternate remedy" with respect to the relator's claims within the meaning of the FCA. In reversing the District Court's determination to the contrary, the *Bledsoe* Court cautioned against the Government's incentive and

---

procuring the settlement, then he or she may return to the court which had jurisdiction over the settlement and move to reopen the judgment under Fed. R. Civ. P. 60(b)(6). *U.S. ex rel. LaCorte*, 185 F.3d at 191. Although Relators are not seeking such relief at this time, it's nevertheless notable that the Government never sought Relators' judgment as to whether the settlements entered with the Settling Surgeons were fair, adequate or reasonable.

efforts to sidestep relators and, thus, discourage private citizens to file *qui tam* suits. The Sixth

Circuit stated, "if the government's extinguishing of a relator's claims by reaching a separate

settlement with the defendant were not considered an 'alternate remedy,'" then:

> [T]he government could decline to intervene in a qui tam suit, then settle that suit's claims separately and deny the relator his or her share of the settlement proceeds simply because the government had not formally intervened in the *qui tam* action. Consequently, the government would frequently carry the incentive to decline to intervene in an action and, having been apprised of possible FCA violations by a private citizen, to independently pursue an investigation of the alleged FCA violator(s). Such a result would not further Congress' legislative intent that the government and private citizens collaborate in battling fraudulent claims, and it would impede, not further, Congress' legislative intent to encourage private citizens to file qui tam suits.

*Bledsoe*, 342 F.3d at 649.

Nor can it be forgotten that the Settling Defendants are jointly liable with SpineFrontier for

damages incurred by the United States due to the payment of kickbacks. Viewed from this

perspective, the Government's decision to settle with parties responsible for the harm to the United

States but not named in the Relators' complaint is clearly an alternative to seeking (and collecting)

the damages through intervention and litigation of the Relators' complaint. *Cf. Bledsoe*, 342 F.3d

at 649 ("[A] settlement pursed by the government in lieu of intervening in a *qui tam* action

asserting the same FCA claims constitutes an "alternative remedy" for the purposes of 31 U.S.C.

§ 3730(c)(5).") Clearly, if the United States chose to avoid paying an award to a relator by

collecting its damages through settlements with responsible joint tortfeasors the relator neglected

to name, the FCA's "alternate remedy" provision would protect the unfortunate relator. When a

relator brings a fraud to the attention of the United States through a qui tam complaint, the United

States cannot attempt to collect the fraud damages through another proceeding, particularly when

the relator's complaint specifically identifies the persons jointly liable with the named defendant.

In the instant matter, the Government cannot sidestep its obligation to share recovery with Relators by merely electing to reach separate agreements with the Settling Surgeons, rather than through the addition of these identified defendants to its Complaint in Intervention.  Relators filed *qui tam* complaints and provided disclosures which unequivocally identified each of the Settling Surgeons by name and alleged with explicit detail their involvement in the illicit kickback scheme, including dates and dollar values of payments made to the surgeons and citations to specific communications as part of the kickback conspiracy.  The Government had no prior knowledge of the scheme or the involvement of the Settling Surgeons, nor would it have had such knowledge, but for the complaints filed by Relators.  Also, Relators were well within their rights to amend their *qui tam* complaints to expand upon their claims and include these additional defendants, which they did consistent with Federal Rule of Civil Procedure 15(a).  Therefore, the Government's pursuit and extinguishing of Relators' claims by reaching separate settlements constitutes an "alternate remedy" under 31 U.S.C. § 3730(c)(5), through which Relators have the right to receive a share of the settlement of such claims.

### C. Awarding Relators a portion of the Government's recovery from the Settling Surgeons promotes the focal policy objectives of the False Claims Act.

The FCA has become "arguably the most powerful tool we have to promote accountability and prevent waste, fraud and abuse."  According to recent figures, the FCA is responsible, from its amendment in 1986 through 2023, for recovering approximately $75 billion for taxpayers, with over $2 billion recovered each year since 2010 under the *qui tam* provisions, and for saving countless more by deterring would-be fraudsters.  As stated by staunch FCA proponent U.S. Senator Chuck Grassley (R-Iowa): "The value of the False Claims Act cannot be overstated; preserving and strengthening it will always be in our nation's best interest."  As also noted by Senator Grassley, the FCA "has been so successful that some federal agencies have established

their own similar programs to incentivize whistleblowers who expose fraud." *See Grassley Law Returns Over $75 Billion in Fraudulent Government Payments to Taxpayers,* Sen. Chuck Grassley (Feb. 22, 2024), *available at:* https://www.grassley.senate.gov/news/news-releases/grassley-law-returns-over-75-billion-in-fraudulent-government-payments-to-taxpayers; *see* U.S. Dept. of Justice, Fraud Statistics, *available at* https://www.justice.gov/media/1273591/dl?inline=.

Congress has often recognized the daunting personal and financial risks whistleblowers take to make possible recoveries under the FCA. *See e.g.*, S. Rep. No. 345 at 28 (acknowledging the "risks and sacrifices of the private relator"); Testimony of Tina M. Gonter, Hearing on the False Claims Act Correction Act (S. 2041): Strengthening the Government's Most Effective Tool Against Fraud for the 21st Century, Before the Comm. of the Judiciary, 110th Cong. 167-85 (2008) (detailing risks to career, income, savings, family, friendship, and personal safety). Nonetheless, courageous whistleblowers—such as Relators—continue to step forward and report misconduct.

The Department of Justice has also routinely praised the value of whistleblowers in exposing fraud on the Government, as well as the risks whistleblowers bear. Indeed, in an effort to attract whistleblowers to submit tips to the Government, Deputy Attorney General Lisa Monaco announced in March of 2024 that DOJ would be launching, later in 2024, a program to award non-culpable whistleblowers who submit accurate information not already known to the Government, and who are not otherwise financially incentivized to come forward through the FCA or whistleblower programs. In announcing the program, Monaco stated: "With these announcements, our message to whistleblowers is clear: the Department of Justice wants to hear from you." Monaco further stated, "Maybe you've got a client at a private equity firm, and she discovers the CFO is forging underlying loan documents. If your client reports it, a portion of the recovery could be hers." *See DOJ to Pay Whistleblowers for Corporate Crime Tips*, Bloomberg (March 7, 2024),

https://news.bloomberglaw.com/us-law-week/justice-department-to-pay-whistleblowers-for-corporate-crime-tips (last visited April 19, 2024).

To that end, it is poor policy for the Government to refuse to pay a relator's award merely because a defendant—who was identified by, and whose participation in the fraud scheme was punctiliously described by, the relator—was not specifically named as a defendant in the original complaint. This tactic is antithetical to the often-celebrated focal policy objectives of the FCA and, if ratified by judicial fiat, would inevitably lead future relators and their counsel to name as defendants in FCA complaints fringe individuals or entities arguably related to the core fraudulent schemers whose conduct gave rise to the action.

First, the Government's refusal to pay an award to Relators for recoveries from the Settling Surgeons "would have the effect of destroying Congress' unambiguous purpose that the government and private citizens collaborate in battling fraudulent claims, and it would impede Congress' legislative intent to encourage private citizens to file *qui tam* suits." *See Bisig*, No. 100-cv-335 (JDT), 2005 WL 3532554, at *4 ("…the FCA ought to be interpreted in a manner that will maintain the incentive underlying the *qui tam* aspect of the FCA."). Failing to pay a relator award in these circumstances—i.e., where the relator identifies and outlines the scheme for the Government, articulates the participation of the settling party, but does not name the party as a defendant—dis-incentivizes and discourages whistleblowers from coming forward. Already fearful whistleblowers will be most unwilling to risk reputation, career, and livelihood if the Government is subsequently permitted to "pull the rug out" by enforcing an unduly restrictive (and unfair) interpretation of the FCA's relator-award provision.

Second, this unreasonable interpretation encourages a "kitchen-sink" approach to pleading, whereby relators will be compelled to (a) make vague, sweeping allegations of fraud, and (b) name

every conceivably implicated person, entity owner, and employee as a defendant to the suit. Neither of these tactics is beneficial to the Government, relators, or taxpayers (nor would it promote judicial efficiency), and are equally not beneficial to such "kitchen sink" defendants upon the inevitable unsealing of the matter.  Rather, the Government expects and openly encourages a detailed complaint and disclosure statement alleging with specificity the fraudulent scheme known to or observed by the relator, something Relators here courageously and skillfully accomplished.

Accordingly, awarding Relators an award from the Government's settlements with the Settling Surgeons is necessary to further the focal policy objectives permeating the FCA.

## CONCLUSION

Based on the foregoing, Relators respectfully request an Order declaring their entitlement to an award from the Government's recovery from the Settling Surgeons or, in the alternative, authorizing Relators to conduct limited discovery into the circumstances of the Government's recovery from the Settling Surgeons.

Dated:  May 17, 2024

Respectfully submitted,

/s/ *Thomas M. Greene*

**SEEGER WEISS LLP**
STEPHEN A. WEISS, ESQ.
sweiss@seegerweiss.com
CHRISTOPHER AYERS, ESQ.
cayers@seegerweiss.com
JUSTIN M. SMIGELSKY, ESQ.
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel: (973) 639-9100

*Counsel for Relators,*
        *John Miller and Walter Bennett*

**GREENE LLP**
MICHAEL TABB, ESQ.
matabb@greenellp.com
THOMAS M. GREENE, ESQ.
tgreene@greenellp.com
RYAN P. MORRISON, ESQ.
rmorrison@greenellp.com
TUCKER D. GREENE, ESQ.
Tucker.greene@greenellp.com
75 Park Plaza
Boston MA 02116
Tel: (617) 261-0040

*Counsel for Plaintiff-Relator,*
        *Charles Birchall, Jr.*

**GREE**
MICHA
matabb
THOM
tgreene
RYAN
rmorris
TUCKE
Tucker.
75 Park
Boston
Tel:  (6

*Counse*
        *C*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that a true and accurate copy of this document was filed through the Electronic Case Filing system and will be served upon the attorney of record for each party registered to receive electronic service this 17th day of May 2024.


 /s/ *Thomas M. Greene*
THOMAS M GREENE, ESQ.