UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, <u>ex rel.</u> CHARLES BIRCHALL, Jr., JOHN MILLER, and WALTER BENNETT, <br><br> Plaintiff-Relators, <br><br> v. <br><br> SPINEFRONTIER, INC. et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil No. 15-12877-LTS |

ORDER ON MOTION FOR ORDER FOR RELATOR AWARD (DOC. NO. 188)

November 4, 2024

SOROKIN, J.

This dispute arises out of consolidated qui tam actions in which the government chose to intervene.  While investigating the allegations involving kickbacks paid to surgeons in the original relator complaints, the government came to settlement agreements with some of the individuals mentioned, but not named as defendants, in the complaints.  The relators claim a share of the settlement money from the agreements with these surgeons.  Though the settlements arose from the fraud described in the complaints, the government contends that the relators may not share in the proceeds of the settlements because the relators failed to name the settling surgeons as defendants in their original complaints.  The Court concludes, in the particular circumstances of this case, that the relators are statutorily entitled to a share of the settlements with the surgeons.

I.   BACKGROUND

A.   The False Claims Act ("FCA") and the Anti-Kickback Statute ("AKS")

The FCA imposes civil liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A)-(B).  A "claim" is "any request or demand . . . for money or property" presented to an officer, employee, or agent of the United States.  Id. § 3729(b)(2).  The AKS imposes criminal liability on anyone who, inter alia,

> knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase . . . or arrange for or recommend purchasing . . . any good . . . for which payment may be made in whole or in part under a Federal health care program[.]

42 U.S.C. § 1320a-7b(b)(2).  A violation of the AKS which results in a federal health care payment is a "per se false claim under the FCA."  Guilfoile v. Shields, 913 F.3d 178, 190 (1st Cir. 2019).  Private individuals can enforce the FCA as "relators" by bringing a civil qui tam action in the name of the government.  United States v. Millenium Labs., Inc., 923 F.3d 240, 244 (1st Cir. 2019).  The government may intervene in such an action and assume primary responsibility over it.  Id.  Regardless of whether the government intervenes, the relator is eligible to collect a portion of any resulting judgment or settlement awarded in the action.  Id.

B.   Qui Tam Actions

On July 2, 2015, plaintiff-relator, Charles Birchall, Jr., filed a complaint against SpineFrontier, Inc., KIC Ventures, LLC, Dr. Kingsley R. Chin, Impartial Medical Expert, LLC ("IME"), KIC Management Group, Inc. ("KICMG"), and AxioMed, LLC, alleging several

violations of the FCA.  Doc. No. 1.[1]  Birchall was formerly employed as Chief Operating Officer

of AxioMed, a company that designs and manufactures artificial lumbar and cervical discs.  Doc.

No. 1 ¶¶ 3, 9.  SpineFrontier manufactures spine surgery devices used by surgeons in several

states.  Id. ¶ 4.  Through the surgeons' use of these devices, SpineFrontier generated more than

$100 million in revenue.  Doc. No. 58 ¶ 7.  KIC Ventures is the parent company of both

SpineFrontier and AxioMed.  Doc. No. 1 ¶ 5.  IME is a consulting company through which many

of the surgeons were purportedly paid "kickbacks" for using SpineFrontier devices.  Id. ¶ 7.

KICMG also allegedly paid "kickbacks" to surgeons directly.  Id. ¶ 8.  Chin controls

SpineFrontier, AxioMed, IME, KIC Ventures, and KICMG.  Id. ¶ 6.

In his complaint, Birchall describes a scheme wherein Chin, through IME, "a sham

consulting company," paid at least ten surgeons; these payments were documented as

"consulting" fees but were actually "kickbacks" for the use of SpineFrontier's products.  Id. ¶¶ 1,

86.  IME generates no revenue on its own; the complaint alleges that Aditya Humad, the

President and Chief Financial Officer of SpineFrontier and KIC Ventures, transferred funds into

IME's account from Chin's other companies, as needed, to pay the surgeons.  Id. ¶¶ 54, 77, 85.

Although not named as defendants, the complaint identifies several surgeons by name—

including Drs. Jeffrey Carlson and Francis Paul DeGenova—and specifies some of the amounts

they allegedly received from IME as kickbacks.  Id. ¶¶ 81-86.  The exhibits attached to the

complaint include other recipients, such as Dr. Michael Murray.  Doc. No. 1-1 at 4.  The

complaint alleges that each named surgeon billed the government via federal programs like

---

[1] The Court refers to documents in the Birchall docket (15-12877) without a preceding notation and will cite to documents in the Miller/Bennett docket (15-12908) with an "MB" preceding the reference (e.g., MB Doc. No. X).

Medicare for their services of performing surgeries while using SpineFrontier products, in violation of the FCA. Doc. No. 1 ¶ 86.

Birchall named as defendants only SpineFrontier, KIC Ventures, Chin, IME, KICMG, and AxioMed, presenting eight claims arising out of the described conduct: violations of the FCA under the theory of causing the presentation of and presenting false claims (Count I) and false statements (Count II) against all defendants except AxioMed; conspiracy to violate the FCA also against all defendants except AxioMed (Count III); a retaliation claim against AxioMed pursuant to 31 U.S.C. § 3730(h) (Count IV); presenting false statements and false claims against all defendants (Counts V-VI); conspiracy to violate the FCA against all defendants (Count VII); and retaliation in violation of 31 U.S.C. § 3730(h) against all defendants (Count VIII). Id. ¶¶ 106-43. Birchall did not name as defendants the surgeons he identified in the complaint as recipients of kickbacks.

Approximately two weeks later, John Miller and Walter Bennett, then John Doe #1 and #2, brought a substantially similar complaint on their behalf and on behalf of the United States and the states in which the conduct took place. MB Doc. No. 1 ¶ 1. Like Birchall, Miller and Bennett named SpineFrontier, KIC Ventures, IME, and Chin as defendants. Id. In addition, they also named LESSurgeons Institute Florida, LLC ("LESSurgeons") and Aditya Humad as defendants. Id. The complaint alleges that part of the IME consulting agreements included a referral service whereby surgeons refer others to become part of the "LESSurgeons" network. Id. ¶ 32. LESSurgeons purportedly directly paid surgeons commensurate to the revenue generated by each surgeon's referrals as part of the "kickback scheme" to promote SpineFrontier products. Id. ¶¶ 31, 50-51.

4

Miller and Bennett's complaint described substantially the same conduct by Chin and his several companies, albeit in more detail than Birchall had.  Specifically, it alleged that at least thirty-four surgeons were retained by the sham consulting company IME in order to provide evaluations and reviews of SpineFrontier products, but those surgeons were actually compensated based on their use of SpineFrontier products and the revenue generated therefrom. Id. ¶¶ 32, 35.  All the while, the defendants caused the surgeons to present false claims and statements by billing government health care programs after treating covered patients.  Id. ¶ 33. The complaint implicates Drs. John Atwater, Francis Paul DeGenova, Joseph Shehadi, and Jeffrey R. Carlson as some of the surgeons involved in the kickback scheme.  Id. ¶¶ 36,43, 46, 85, 106.  The exhibits attached to the complaint also implicates Drs. Agha Khan and Michael Murray.[2]  MB Doc. No. 1-3.  Similar to Birchall's complaint, Miller and Bennett's complaint brought the following four claims against all defendants: violating the FCA by presenting false claims (Count I); violating the FCA by making false statements (Count II); conspiracy to violate the FCA (Count III); and finally, a retaliation claim pursuant to 31 U.S.C. § 3730(h) (Count IV). Id. ¶¶ 210-23.  In addition, they pled several state claims arising out of conduct in Massachusetts, Colorado, Connecticut, District of Columbia, Florida, Illinois, Indiana, Maryland, New Jersey, New York, Oklahoma, Texas, and Virginia.

C.    Government Intervention

Approximately five years after both complaints were filed, the United States filed a notice of election to partially intervene in relator Birchall's complaint as to Counts I, II, and III against SpineFrontier, KIC Ventures, IME, Chin, and KICMG.  Doc. No. 54 at 2.  The United

---

[2] The exhibits to the original MB complaint were not initially scanned into ECF.  On April 11, 2022, they were inadvertently destroyed by the Clerk's Office.  MB Doc. No. 102.  At the request of the Court, the Clerk's Office subsequently contacted the plaintiffs' counsel for an a replacement copy.  The exhibits were scanned into ECF on September 19, 2024.

States also elected to intervene in Bennett and Miller's complaint as to Counts I, II, and III against SpineFrontier, KIC Ventures, IME, Chin, and Humad, but declined to intervene on all counts against LESSurgeon.  Id.  The United States subsequently filed its complaint in intervention on March 5, 2020.  Doc. No. 58.  In addition to the named defendants above, it also named Vanessa Dudley, sole employee of IME and Chin's partner, as a defendant.[3]  Id.

In its complaint in intervention, the government described the same conduct identified by both relator complaints.  Namely, it alleged that the defendants, between March 2013 and December 2018, paid and conspired to pay millions of dollars in sham consulting fees to surgeons as kickbacks to induce them into using SpineFrontier's products in violation of the FCA.  Id. ¶ 2.  It identified $8 million paid in kickbacks to thirty-five surgeons through IME.  Id. ¶ 7.

D.    Settlement Agreements

The complaint in intervention also referenced settlement agreements that the government reached with five of the surgeons who received kickbacks: Drs. Atwater, DeGenova, Khan, Murray, and Shehadi.  Id. ¶ 105.  On April 24, 2020, the government publicly announced a settlement with a sixth surgeon, Dr. Carlson (together, "Settling Surgeons").  Doc. No. 194 at 4 (citing Press Release, U.S. Att'y Off., Dist. Mass., Surgeon Agrees to Pay $1.75 Million to Resolve Allegations that He Accepted Kickbacks from SpineFrontier (Apr. 24, 2020), https://www.justice.gov/usao-ma/pr/surgeon-agrees-pay-175-million-resolve-allegations-he-accepted-kickbacks-spinefrontier [https://perma.cc/WZ94-6CDQ]).  In total, the government recovered $3,307,064.00 from the Settling Surgeons.  Doc. No. 189 at 4.  All of the Settling

---

[3] The government did not intervene as to AxioMed.  Doc. No. 58.  The Clerk's Office terminated AxioMed as a defendant upon the filing of the complaint in intervention.  Doc. No. 59.  The only outstanding claim against AxioMed relates to Birchall's retaliation claim, which is not relevant here.

Surgeons were identified in one or both of the relator complaints as receiving kickbacks or sham consulting fees; however, none of the Settling Surgeons were named as defendants in either of the original complaints. On August 10, 2022, relators Miller and Bennett filed an amended complaint adding the Settling Surgeons, Dudley, and two other surgeons as defendants. MB Doc. No. 112. This amended complaint has not been served.

On November 27, 2023, the government, Birchall, Miller, and Bennett ("relators"), and the defendants entered a settlement agreement. Doc. No. 160. The defendants "agreed to pay between $1,085,000 and $234,732,075, depending on certain financial contingencies, of which the first-to-file Relator(s) will receive a share of between 15 and 25 percent of the proceeds." Doc. No. 194 at 5. On January 16, 2024, the parties filed a joint stipulation of partial dismissal, except as to the entitlement to reasonable expenses, attorneys' fees, and costs under 31 U.S.C. § 3730(d)(1); relief from the retaliatory actions under 31 U.S.C. § 3730(h); the exact settlement amount with the defendants; and whether relators are entitled to a share of the settlement with the Settling Surgeons. Doc. No. 160 at 2.

E.    Instant Dispute

After settlement negotiations failed with respect to a possible share of the government's settlement with the Settling Surgeons, the relators filed a joint motion for an order for relator award on May 17, 2024. Doc. No. 188. In it, they claim that they are entitled to a share of the government's recovery from the Settling Surgeons and any future recovery from any similar agreements. Id. at 1-2. The United States opposed the motion on June 14, 2024. Doc. No. 194. The relators filed a reply on June 22, 2024. Doc. No. 197. The Court held a hearing on October 15, 2024.

II.    DISCUSSION

The Court recognizes that neither the Circuit nor the Supreme Court have expressly resolved whether a relator must name each settling party as a defendant to recover a portion of the settlement from that party.  In other words, no party has brought to the Court's attention—and the Court's own research found no—binding caselaw directly responsive to the question of whether, to constitute the same claim of which relators are entitled a share, the relators must name the same defendants.[4]  Given that the issue the Court resolves here today appears to be one of first impression, the Court looks to how the Circuit has previously conceptualized a "claim" in other contexts for guidance.  The Court proceeds as follows.  First, it lays out the relevant provisions of the statute at issue, then the different approaches to comparing claims under those provisions.  Next, the Court applies those approaches to the instant case.  Finally, the Court concludes that the outcome of its application comports with the statute's structure and purpose and a broader understanding of a "claim."

A.    The Award Provision

Subsection 3730(d)(1) of Title 31, entitled "[a]ward to qui tam plaintiff," provides, in relevant part:

> If the Government proceeds with an action brought by a person under subsection (b), such person shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action.

---

[4] In 2009, the Tenth Circuit did note that the "identity of a defendant constitutes a material element of a fraud claim, which, under our 'same material elements' standard, brings it under the statutory definition of 'facts' upon which the action is based." In re Nat. Gas Royalties ex rel. United States v. Exxon Co., USA, 566 F.3d 956, 962 (10th Cir. 2009).  That statement arose, however, in a first-to-file context in favor of entitling relators a share of a fraud claim with different defendants "seeking distinct damages arising out of a separate injury." Id.

8

To be entitled to the relator's share, a relator must be a person who "br[ings]" "an action under . . . subsection [3730(b)]." 31 U.S.C. § 3730(d)(1). As "[o]ne of the FCA's unusual features is its use of 'claim' and 'action' interchangeably to refer to a case," the First Circuit has held that "[g]overnment intervention in an 'action' under the first sentence of § 3730(d)(1) means government intervention in an individual claim." United States ex rel. Lovell v. AthenaHealth, Inc., 56 F.4th 152, 160 (1st Cir. 2022). In examining the FCA's qui tam provisions, the First Circuit utilizes a "claim-by-claim analysis." Id.

B.    Approaches to Claim Comparisons

Section 3730 establishes a number of different approaches to claim comparisons. First, the award provision entitles a qui tam plaintiff to recovery of an award when the "[g]overnment proceeds with an action [or claim] brought by a person" under § 3730(b). See 31 U.S.C. § 3730(d)(1). Determining whether a relator satisfied the statutory prerequisite necessarily requires inquiring "whether the government's recovery . . . constitutes the 'proceeds of the . . . settlement of the claim' [the relator] brought." Millenium, 923 F.3d at 252. In so doing, the Court must assess the "overlap between Relator's allegations and the conduct discussed in the settlement agreement." Id. (quoting Rille v. PricewaterhouseCoopers LLP, 803 F.3d 368, 373 (8th Cir. 2015) (en banc)). Although the Court confines its analysis to the "pleadings," supplemented by "facts susceptible to judicial notice," id. at 252, the analysis involves consideration of the substance of the qui tam complaint measured against the substance of the government's settlement.[5] See id. at 254 n.19 (determining relator's entitlement to proceeds might require asking whether relator "ple[]d the conduct that formed the basis of the claims the government ultimately settled").

---

[5] Plainly, this analysis is not a mere technical comparison of parties and causes of action. Of course, no party so contends.

This is much the same inquiry a court undertakes when making another claim comparison required by § 3730.  Subsection (b)(5) provides "no person other than the [g]overnment may intervene or bring a related action [or claim] based on the facts underlying the pending action [or claim]."  31 U.S.C. § 3730(b)(5).  This is the so-called first-to-file bar.  It requires deciding whether the later-filed complaint "contained 'all the essential facts' of the fraud alleged" by the first complaint.  Millenium, 923 F.3d at 252 (quoting United States ex rel. Ven-A-Care of the Fla. Keys, Inc. v. Baxter Healthcare Corp., 772 F.3d 932, 938 (1st Cir. 2014)).  Satisfying this "standard does not require identity between the two complaints."  Id. (cleaned up).  This comparison is also "limited to the four corners of the relevant complaints."  Id. at 253.

In a first-to-file dispute, while comparing two relator complaints, the First Circuit examined whether they "allege[d] similar frauds [as opposed to] different frauds with different mechanisms."  Id.  To come to such a conclusion, the Court compared the substance of the two complaints as the law required by considering the type of fraud, the alleged fraudulent conduct, the alleged essential facts, and the alleged mechanisms of the fraud.  Id. at 254.  It did not, in contrast, conduct a technical comparison of the cause of action brought or the named plaintiffs and defendants in each complaint.  Id. at 253.  Similarly, though in a slightly different context, the Eighth Circuit held that "a relator seeking recovery [under § 3730(d)(1)] must establish that 'there exists [an] overlap between Relator's allegations and the conduct discussed in the settlement agreement.'"  Rille, 803 F.3d at 373.  In Millenium, the First Circuit cited favorably this very point, 923 F.3d at 252, highlighting that the analysis of one type of claim comparison might apply to another.

Still a third claim comparison arises under the statute's alternate remedy provision.  When the government does not intervene in a relator's action or claim, the relator "shall have the

10

same rights in such proceeding as such person would have had if the action had continued under this section."  31 U.S.C. § 3730(c)(5).  The reach of this subsection is quite broad, for it encompasses "any alternate remedy available to the [g]overnment" through which the government has elected "to pursue its [FCA] claim."  Id.; see also United States ex rel. Sun v. Baxter Healthcare Corp., 892 F. Supp. 2d 341, 344 (D. Mass. 2012); United States ex rel. Barajas v. United States, 258 F.3d 1004, 1010 (9th Cir. 2001) ("The language of § 3730(c)(5) places no restrictions on the alternate remedies the government might pursue.").  In such circumstances, the inquiry is "whether there exists any overlap between Relator's allegations and the conduct discussed in the settlement agreement."  United States ex rel. Bledsoe v. Cmty. Health Sys., 342 F.3d 634, 651 (6th Cir. 2003).  Where a settlement agreement "extinguished all of Relators' pending federal False Claims Act pricing claims and thus effectively settled that aspect of their action," denying the relators a share "would be inconsistent with Congress' legislative intent to encourage private citizens to file qui tam suits."  Sun, 892 F. Supp. 2d at 345-46 (cleaned up).  Thus, this claim comparison also involves looking to the substance of the complaints.

      C.    Application

The guidance from all three approaches applied here would yield that relators must specifically, and with particularity, allege the fraud, the mechanism, the essential facts, and the conduct giving rise to the claim settled by the government.  Here, the relators did that and more.  The relators brought complaints alleging the same fraud described by the government in their settlement agreements with the Settling Surgeons—illicit payments for the use of SpineFrontier surgical products.  The relators also alleged the same specific mechanism of fraud—kickbacks paid in the form of sham consulting fees based on the generated revenue SpineFrontier gained by the surgeon.  Specifically, the kickbacks received came in the form of "sham consulting services,

11

bogus research and educational grants, travel and lodging expenses, expensive meals and wine, and other gifts and discounts." MB Doc. No. 1 ¶ 150.

The essential facts underlying the government's settlement mirrored the allegations in the relators' initial complaints, including the identities of some of the surgeons paid, the amounts paid, the mechanism by which they were paid, and the dates they were paid. Compare MB Doc. No. 1 ¶ 32 ("IME agrees to compensate the Consultants between $500 and $1,000 per hour for their work, depending upon the type of spine-related medical device product reviewed."), with Doc. No. 58:1 ("SpineFrontier agreed to pay Dr. DeGenova at a rate of $500 per hour . . . [and told him he] could bill a flat rate of 1 hour whenever he used one of SpineFrontier's cervical spine products, and a flat rate of 2 hours whenever he used one of SpineFrontier's lumbar spine products."). Indeed, both complaints together identified every single Settling Surgeon by name and described the fraudulent conduct presented in the settlement agreements with some degree of specificity.[6] See Doc. No. 1 ¶¶ 76, 79, 81-84; Doc. No. 1-1; MB Doc. No. 1 ¶¶ 36, 43, 45-46, 82-88, 106-07, 109; MB Doc. No. 1-3.

Moreover, the facts set forth by the relators reasonably alleged that the Settling Surgeons knowingly accepted the kickbacks. See Doc. No. 1 ¶¶ 77-78; MB Doc. No. 1 ¶¶ 40, 138, 150. Specifically, the following factual allegations support the reasonable inference that the surgeons "knowingly and willfully," 42 U.S.C. § 1320a-7b(b)(1), received illegal remuneration for their use of SpineFrontier products: (1) the "payments [were] not proportional to the time or energy

---

[6] Of course, had the government used the original complaint as a jumping-off point and discovered a non-overlapping fraudulent scheme involving the surgeons during its own investigation, the relators would not be entitled to a share of any settlement agreement arising out of that non-overlapping conduct. See Rille, 803 F.3d at 374 ("The Act does not provide for an award to relators from the proceeds of settlements that 'resulted from' the claim or were 'caused by' the claim; relators are limited to a percentage of 'proceeds of the . . . settlement of the claim.'").

necessary . . . to complete the unnecessary evaluations," Doc. No. 1 ¶ 78; (2) the "amount paid to the surgeons far exceeds the fair market value of any marketing information," id.; (3) "many" of the payments "were sent to home addresses rather than to physician practices or offices," id. ¶ 73; (4) the surgeons did not provide any follow-up product review, feedback or evaluation, or other consulting work about "eighty percent of the time," MB Doc. No. 1 ¶ 40; (5) the amounts paid related to "a percentage of the profits from sales of SpineFrontier medical devices," id. ¶ 69; and (6) "the consultants all underst[ood] that the payments [were] directly related to SpineFrontier devices," Doc. No. 1 ¶ 77.[7]  Accordingly, there was certainly "factual overlap" between the original complaints and the settlement agreements with the Settling Surgeons.  See Rille, 803 F.3d at 373.

D.    Statute's Structure and Purpose

The structure of the statute also supports focusing on the nature or substance of the relators' allegations.  For example, the second sentence of § 3730(d)(1), for purposes of evaluating the size of the relators' share, distinguishes between an action "based primarily on disclosures of specific information . . . relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media" and one, like the one at issue here, based on "information provided by the person bringing the action."  That the very subsection at issue invokes a broad reading of "action" or "claim" demonstrates an intent that courts should look to the substance of an action or claim.

---

[7] Of course, if the relators sought a share of the recovery from the Settling Surgeons based upon complaints that neither identified the surgeons nor advanced factual allegations supporting an inference of scienter, their request would stand on meaningfully different footing.

The statute is "part of the larger balancing act of the FCA's qui tam provision, which attempts to reconcile two conflicting goals, specifically, preventing opportunistic suits, on the one hand, while encouraging citizens to act as whistleblowers, on the other." United States ex rel. Wilson v. Bristol-Myers Squibb, 750 F.3d 111, 117 (1st Cir. 2014) (cleaned up); see also Exxon, 566 F.3d at 960 (noting statute "further[s] the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own"). Applying the Circuit's caselaw appears to strike this balance. Relators are not entitled to a share of any award merely because the government would not have discovered some fraud without them. See Rille, 803 F.3d at 374; United States ex rel. Willette v. Univ. of Mass., No. 4:13-cv-40066, 2016 U.S. Dist. LEXIS 89539, at *15 (D. Mass. July 11, 2016) (finding "fact that [relator] was the original source of the information is not sufficient to entitle him to collect a portion of the proceeds"). Rather, the substance of the claim the relators brought cannot be distinguished from the substance of the claim settled with the Settling Surgeons.

E.    Alternative "Claim" Contexts

The government's position—that the word "claim" (or "action") imposes a foundational requirement that the relator name the settling party as a defendant in the relators' complaint—certainly draws a bright line easily applied. Nonetheless, it would in no way obviate the need to analyze the substance of the relators' fraud claim to apply the various provisions of the statute discussed above. And, the Court undertakes this analysis in light of the statutory language and purpose of § 3730, not by applying, as the government invites the Court, the standards outlined in the Federal Rules of Civil Procedure. See Millenium, 923 F.3d at 253 ("The first-to-file bar is designed to be quickly and easily determinable, simply requiring a side-by-side comparison of the complaints."). This weighs in favor of a broader understanding of a "claim," rather the more

14

technical understanding applied by the Rules of Civil Procedure.  See United States ex rel. Boothe v. Sun Healthcare Grp., Inc., 496 F.3d 1169, 1177 (10th Cir. 2007) (explaining courts must determine jurisdictional status of qui tam claim "based on a review of the substance of the complaint, not just how it may be formally structured"); see also Cmty. Health Sys., 342 F.3d at 649 ("If the government has recovered funds lost from conduct asserted in Relator's qui tam action, then the government has essentially settled Relator's claims, regardless of whether it formally intervened in Relator's action or not.").

In some contexts, "claim" might refer to "[a] demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for."  Claim, Black's Law Dictionary (12th ed. 2024).  To bring a "claim" against an entity in such a sense means naming the entity as a defendant.  However, in other contexts, "claim" is used much more broadly.  For example, a "claim" can bar future suits against non-parties in certain circumstances.  See Taylor v. Sturgell, 553 U.S. 880, 893-95 (2008) (holding nonparty may be precluded from asserting prior adjudicated claim in six situations).  And under the relation back doctrine, a claim against one party can authorize the addition of an otherwise late filing against another party where "the allegations of the amended complaint [are] tethered to the conduct, transactions, or occurrences underlying the original claims".  See Anza Tech., Inc. v. Mushkin, Inc., 934 F.3d 1359, 1372 (Fed. Cir. 2019) (remanding otherwise untimely claim to assess whether relation back doctrine applies).

In any event, even in the context of a particularity challenge under Rule 9(b) of the Federal Rules of Civil Procedure, the First Circuit has "repeatedly emphasized that there is no checklist of mandatory requirements that each allegation in a complaint must meet to satisfy Rule 9(b) . . . and that a somewhat more flexible standard applies in qui tam actions where the

15

defendant is alleged to have induced third parties to file false claims."  Hagerty ex rel. United

States v. Cyberonics, Inc., 844 F.3d 26, 31 (1st Cir. 2016) (cleaned up); cf. Ven-A-Care, 772

F.3d at 938 ("[T]o provide sufficient notice to the government of the alleged fraud and bar a

later-filed complaint under § 3730(b)(5)[,] earlier-filed complaints must provide only the

essential facts to give the government sufficient notice to initiate an investigation into allegedly

fraudulent practices[.]").

For all of these reasons, the Court concludes the term "claim" in § 3730 reaches more

broadly than the narrow technical sense the government advances.  Accordingly, either the

relators brought the claim underlying the settlement agreements with the Settling Surgeons or the

settlement resolution with these Surgeons is an "alternate remedy" for the claim filed by the

relators.[8]  In either event, the relators are entitled to a share of the amounts paid by the Settling

Surgeons.[9]

III.    CONCLUSION

For the foregoing reasons, the relators' joint motion for relator award under the FCA

(Doc. No. 188) is ALLOWED.  Within twenty-eight days of this Order, the parties shall confer

---

[8] At the hearing on the instant motion, relators suggested their request for a share of the settlement fit better under the alternate remedy provision of the statute.  The Court is not persuaded, based on the limited briefing before it, that this provision applies a different standard of recovery.  As noted above, the alternate remedy provision sweeps broadly to reach resolution of all claims of "falsity or fraud to obtain money or property" of the United States in violation of § 3729, and no doubt reaches a settlement made by the government even in the absence of the government's intervening.  United States ex rel. Kennedy v. Novo A/S, 5 F.4th 47, 55 (D.C. Cir. 2021).  But in those (and all) circumstances under the alternate remedy provision, the relator "shall have the same rights . . . as such person would have had if the action [here, read settlement] had continued under this section."  31 U.S.C. § 3730(d)(5).  In other words, the entitlement of a relator to a share of a settlement is neither broader nor narrower in the context of the alternate remedy and is dictated by § 3730(d)(1).

[9] The Court need not resolve the distribution of the award among the relators, as no party has presented that issue.

16

and submit a joint status report with their joint or separate proposals for resolving the

outstanding issues in this litigation.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge